*In re* SEARCHILL ESTATE.

FULCO *v.* ELDRED.

1. WILLS —ADMISSION TO PROBATE.
    Refusal to probate will drawn by suggestion and under direction of one taking under it, who redrafted it leaving only himself, his brother, and his sister as beneficiaries, who gathered and took the witnesses of the will to the hospital where it was executed by testator, and who had possession of the will from the date of execution until the time of filing for probate, *held*, proper, the verdict being clearly supported by the evidence.

2. SAME—COMPETENCY OF TESTATOR—EVIDENCE—NURSES' NOTES—HOSPITAL RECORDS.
    Nurses' notes, including observations and notations about mental condition of testator, which were vitally significant to physicians in treating testator's illness and which were part of hospital record, were properly admitted in will contest in which one of the issues was the competency of the testator to make the will.

3. EVIDENCE—RECORDS MADE IN REGULAR COURSE OF BUSINESS—HOSPITALS.
    Hospital records made in the regular course of hospital business which are made at or near the time of the act, transaction, occurrence, condition, or event recorded are admissible into evidence under the business records act (CLS 1961, § 600-.2146).

---

REFERENCES FOR POINTS IN HEADNOTES
[1]  57 Am Jur, Wills §§ 435, 436, 944.
[2]  57 Am Jur, Wills § 127.
[3, 4]  26 Am Jur, Hospitals and Asylums § 6; 57 Am Jur, Wills § 127.
[5]  57 Am Jur, Wills § 128.
[6]  58 Am Jur, Witnesses § 734.
[7]  53 Am Jur, Trial § 494.

4. SAME—HOSPITAL RECORDS—TREATING PHYSICIAN.

   Testimony of doctor, whose opinion is based in part on the hospital records, is admissible in evidence in will contest on issue of testator's competency since the notations made by nurses in the hospital record and the laboratory reports in the records are important to the treating doctor's analysis of the data and his treatment.

5. WILLS—COMPETENCY OF TESTATOR—LAY PERSONS.

   Testimony of lay witnesses on question of incompetency of testator is proper where a foundation is laid and an opportunity is given for cross-examination, thus making available to the jury the observations upon which the opinions were based.

6. WITNESSES—CREDIBILITY—COMMISSION OF A CRIME.

   Commission of a crime may be shown for purpose of affecting the credibility of a witness (CLS 1961, § 600.2159).

7. SAME—READING OF PERJURY STATUTE.

   The reading of the perjury statute to all of the witnesses at a time when the proponent of a will was on the stand but before he testified to most of the material matters in the case and before there was any discrepancy in his testimony *held,* not improper.

Appeal from Bay; Dardas (Leon R.), J. Submitted Division 3 November 7, 1967, at Grand Rapids. (Docket No. 3,081.) Decided March 20, 1968.

Petition by James Fulco for admission to probate of a will of Joseph Searchill dated December 16, 1963. Clifford Eldred contested. Verdict for contestant. Motion by James Fulco for judgment notwithstanding the verdict, or in the alternative for a new trial, was denied. Affirmed.

*Bernard S. Frasik* and *Joseph J. Favazza,* for plaintiff.

*Milton E. Higgs,* for defendant.

HOLBROOK, J. Appellant, James Fulco, is the proponent of a purported will of one Joseph Searchill dated December 16, 1963. Appellee, Clifford Eldred, a legatee under a prior will, contested the admission of the will in question to probate on 3 grounds: (1) The will was not lawfully executed, (2) the testator lacked mental competency, and (3) the will was induced by fraud and undue influence. The jury found against the purported will on returning a verdict for the contestant. Following the trial court's denial of his motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, the proponent of the will has appealed to this Court.

The position of the proponent for the purported will is the same in this Court as presented to the trial court upon his motion for judgment notwithstanding the verdict, or in the alternative, for new trial.[1] After careful review of the record, we find that the trial judge in his written opinion denying proponent's motion adequately set forth the facts and properly met all of the issues raised by the proponent of the will. We adopt his opinion as our own and quote from it as follows:

---

[1] The following questions have been put to this Court by the proponent:

(1) Did the trial court err in denying proponent's motion for a directed verdict?

(2) Was the verdict of the jury supported by the law applicable?
(3) Was the verdict of the jury supported by the evidence?
(4) Did the trial court err in admitting in its entirety the hospital records?

(5) Did the trial court err in admitting the testimony of lay witnesses on the question of incompetency without proper foundation therefor?

(6) Did the trial court err in admitting the testimony of E. J. Kulinski, M.D., expressing an expert opinion as to the testator's incompetency?

(7) Did the trial court abuse its discretion in admitting evidence of proponent's commission of a crime some 33 years previously?

(8) Did the trial court err in reading the perjury statute to the proponent while on the witness stand and in the presence of the jury?

"Many of the facts in the case are not disputed. Joseph Searchill was admitted to the Veterans Hospital in Saginaw, Michigan, on November 28, 1963, and died on January 20, 1964. While a patient in the hospital he attached his mark to the instrument in question, allegedly his last will and testament, which purported to leave all his property in three equal shares, to wit; Ralph Fulco, James Fulco, and Rose Redivo. James Fulco, the proponent, testified that on the 11th or 12th of December, 1963, while Mr. Searchill was a patient in the hospital, he told him to go and see Joe Favazza and draw a will (p 249 of transcript). The will was to be made out for Mr. Fulco, his brother and sister, and for Mr. Searchill's brothers and sister who lived in Italy. It was conceded that whatever Mr. Favazza did, he did under the direction of James Fulco and not under the [immediate] direction of Mr. Searchill. That first instrument drafted by Mr. Favazza was taken by Mr. Fulco back to the hospital and read to Mr. Searchill. The transcript at p 257 charges that only Mr. Fulco and Mr. Searchill were present when that first instrument was read to Mr. Searchill and the only record of that conversation comes from Mr. Fulco's tesitmony. Mr. Fulco testified that the deceased told him to take it back and leave his brothers and sister out of the will, and simply to include the two Fulcos and Rose Redivo. Mr. Fulco then testified that he took it to the Republic Hotel to a public stenographer because Mr. Favazza was busy. He then had the instrument redrafted leaving out Mr. Searchill's brothers and sister in Italy. That instrument was typed out under the direction of James Fulco. There is no representation that the stenographer ever talked to Mr. Searchill. Whatever was contained in the instrument was there because James Fulco directed the stenographer to put it in and that same holds true of anything which was left out. This instrument was the one which was ultimately produced and offered as the last will and testament of Joseph Searchill. James Fulco

gathered the witnesses and took them to the Veterans Hospital, where it alleged the instrument was executed by the mark of the testator on Monday, December 16, 1963. The date on the will which originally was inserted was crossed off and December written in. Testimony further indicates that the first date inserted was 15, and that 16 was written over the top of the 15. It appears that three witnesses attested to the mark and were available to testify in court, although only two were in fact called. The attorney who drafted the original instrument before it was redrafted in its final form never talked with the deceased before or after the event with regard to any of the subject matter involved. James Fulco admitted in his testimony at p 263 that the doctor told him that Mr. Searchill was 'quite bad' at the time. Prior to this time, James Fulco did not cash any checks for the deceased, paid no bills for him, and did not represent he did any business for him. The testimony shows that the deceased had his hands in restraints [Posey mittens] on December 16th [and his body movement was restrained] by a device known as a locked Posey belt. James Fulco did not call a nurse, but simply removed one of the mitts from the hand of the deceased and placed a pen in it. James Fulco then testified that after he read the instrument to Mr. Searchill, Mr. Searchill said he couldn't take it with him and that he had some taxes to pay and that he might as well sign it.

"On cross-examination of James Fulco, he did not deny that at the time of the pretrial deposition he said that he suggested Joseph Favazza as the lawyer to make out the will and that the suggestion was not made by Mr. Searchill. Attorney Favazza had done other legal work for James Fulco. Mr. Searchill never discussed with James Fulco that he had consulted a lawyer at a prior time, at which time a will for him had been drafted. Mr. Maiola and James Fulco testified that they scratched out the word 'November.' Fulco, under cross-examination,

admitted that the 16th appearing on the purported will could also be read as 15. James Fulco produced the will and it was filed in the probate court for Bay county along with a petition for probate of it on the same day that Mr. Searchill died. Despite the fact that James Fulco was the executor named in that will, he allowed Clifford Eldred, the contestant, to proceed with the funeral arrangements for the deceased. On cross-examination, James Fulco conceded that he forgot, at the time of giving his deposition, to tell about the first instrument that was prepared and which Mr. Searchill did not sign. The instrument here in question which was offered for probate by James Fulco was in his possession from the time it was executed until the time he took it to Mr. Favazza on the day of Mr. Searchill's death and its filing in the probate court with his petition.

"In his motion the proponent complains that the verdict of the jury is contrary to law and facts and is not supported by the evidence. Insofar as the verdict being supported by the evidence is concerned, the court is of the opinion that the verdict was well within and amply supported by the proofs. The court must further state that had it been submitted for the court's decision it would have reached the same conclusion under the proofs as presented.

"In addition to lay witnesses the contestant produced the testimony of two medical doctors, one of whom had examined the deceased and referred him to the Veterans Hospital for admittance at the onset of his terminal illness and a second who had the deceased under his care continuously from that time forward until his death at the Veterans Hospital.

"Proponent assigns as error the ruling of the court in admitting the hospital record and especially that portion including the nurses notes. For clarification, it should be noted that the offer of the hospital records included only the medical portion as opposed to the administrative portion of the records. Actually, although the entire medical portion was read in evidence, the entire exhibit was not read to the

jury and particularly certain information given Dr. Dowidat by relatives was excluded, as not in the scope of the offer and its receipt in evidence, at least in its presentation. The foundation laid for the admission of the hospital records included the testimony of Jerome Bray whose employment at the Veterans Hospital included supervision of the medical records, librarians, and the clerks who do the actual filing. His function adequately qualifies him as custodian of the records. He identified the records offered as that of the patient and testified, with knowledge, as to the method of preparing the record, timeliness, regularity and accuracy. It was established through him that these entries were made in the regular course of the hospital business to make these records at or near the time of the act, transaction, occurrence, condition or event recorded. He further testified with regard to the medical portion of the records, including the nurses' notes, that the doctor uses the records in the course of the treatment of the patient; and, in fact, makes decisions of life and death based on the accuracy of the records.

"The treating doctor at the hospital, Dr. Dowidat, testified that the nurses' notes and the observations recorded were all made and initialed by registered nurses in whom he had the utmost confidence insofar as their ability and training are concerned. He further testified that these nurses and observations were of vital importance to him for the purpose of aiding and assisting him to make decisions regarding the care and treatment of a patient who was suffering from acute cirrhosis of the liver.

"The foundation laid in the admittance of the medical portion of the hospital records, including the nurses' notes, was well within the principles laid down in Case v. Vearrindy (1954), 339 Mich 579; and Bauer v. Veith (1964), 374 Mich 1. The testimony of Mr. Bray and Dr. Dowidat was further fortified by the testimony of Dr. Kulinski, specialist in internal medicine, who testified that the observa-

tions and notations of the nurses with regard to the mental condition of the patient were vitally significant from a medical standpoint considering the nature of the patient's illness. He testified that in cases involving 'Laennec's' cirrhosis he is particularly concerned about mental confusion as an early indication of the worsening of the patient's condition. In his testimony he related the mental confusion to the level of blood ammonia which appears in the laboratory reports demonstrating that there was a progressive deterioration of the patient's condition. There were approximately 15 nurses associated with the treatment of Mr. Searchill, together with numerous laboratory and X-ray technicians, and to require that each of these persons be called to testify in cases of this kind would not serve any useful purpose. In the opinion of the court it is doubtful that their recollection would be any better than their recorded statements, because of the number of people that are handled in the normal course of hospital routine. Furthermore, there are few records, the accuracy of which are more significant than hospital records, because of the nature of the decisions that are made based upon their accuracy. Those who are charged with making these records are well aware of that fact. The court sees no reason to change its ruling in allowing these records to be received in evidence under the provision of the business records act[2] and is further of the opinion that there was no error in admitting them.[3]

"Insofar as the testimony of Dr. Kulinski is concerned, it would appear that the proponent objects on the ground that Dr. Kulinski's opinion was based purely on the hospital records. Actually the proofs show that Dr. Kulinski examined the deceased on November 27, 1963 at his home and 1 or 2 hours

[2] CLS 1961, § 600.2146 (Stat Ann 1962 Rev § 27A.2146).
[3] Dr. Dowidat testified that in his treatment of Mr. Searchill, he personally visited the patient each day while he was hospitalized. He also testified as to his reliance on the nurses' notes in the hospital records and that he checked directly with the nurses concerning their notes.

prior to his admittance to the Veterans Hospial at
12:45 a.m. on November 28, 1963. Dr. Kulinski was
shown to be eminently qualified in the field of inter-
nal medicine and is in fact certified by the American
Board of Internal Medicine. The doctor testified
that Mr. Searchill's health and physical condition
fell within the scope of his specialized practice of
medicine. He testified as to the significance of the
laboratory data and of the administration of drugs
appearing in the hospital records. He further testi-
fied as to the extreme importance of the nurses'
notes to the treating physician and their significance.
He explained their significance by·relating them to
the blood ammonia which appeared in the laboratory
reports finding the necessary observations to be con-
sistent with the laboratory reports. With the founda-
tion laid in regard to his connection with the case,
his treatment and observations and his analysis of
the pertinent data, there could be no question but
that the court would have been in error had it ex-
cluded the doctor's testimony.

"As to the testimony of lay witnesses on the ques-
tion of incompetency, both proponent and contestant
offered lay witnesses; in each case before admitting
their testimony a foundation was laid to the satisfac-
tion of the court. * * * In each case ample oppor-
tunity for cross-examination was offered each side
so that the jury would have available to them the
observations upon which any opinions were based.

"With regard to the question of proper execution
of the will according to the statute being submitted
to the jury as well as the question of submitting the
presumption of undue influence, the court finds no
error. * * *

"With regard to the question of admitting evi-
dence of defendant's[4] commission of a crime many
years ago, it is the position of the court that con-
viction of a crime may be shown for the purpose of

---

[4] According to the transcript, proponent Fulco was the one who
was questioned concerning a crime committed many years ago.
See last paragraph of quoted opinion.

affecting the credibility of the witness under CLS 1961, § 600.2159 (Stat Ann 1962 Rev § 27A.2159). The court finds no area of discretion in the matter of the question, but if there were would take the position that there was no abuse of discretion in the instant case. Proponent was offered ample scope of examination to explain the remoteness in time and other circumstances which counsel for proponent did bring forth and which may well have influenced the jury favorably as to credibility.

"With regard to the question of reading the perjury statute, it should be noted that the statute was not read to Mr. Fulco alone, but to all witnesses that were in the courtroom. The court stated (p 250):

" 'In order to clarify the whole thing, I think enough witnesses are here and because it did come up, I will read the perjury statute for everybody. We will get it clear for everybody. Anybody who has been a witness in this matter, taken an oath or about to take an oath, there is a law in the State of Michigan which defines the crime of perjury.' The court went on to read the statute, explained it and stated, 'this is for the benefit of all witnesses who are at present in the courtroom and for the benefit of the witness on the stand.'

"It should be noted at the time that Mr. Fulco testified and at the time the perjury statute was read was at a time before he had testified as to most of the material matters in the case. The court fails to see that at the time this occurred there was any prejudice to him or anyone else. At the time the court had no discrepancy in testimony before it given by Mr. Fulco and such discrepancies that did occur in his testimony occurred at a later time. It may very well be that the discrepancy between his testimony in court and his testimony at the time he gave his discovery deposition was the result of the serious consideration given by him to that statute. It seems to the court that a jury would likely believe a man's testimony or place more weight upon it with knowledge that he is aware of the serious consequences

of not telling the truth than if he were not aware of it. Counsel for proponent attempts to tie in the reading of the statute with the questions regarding his criminal record.

"The record discloses as a matter of fact the reading of the statute occurred on Thursday, January 20, at p 250 of the transcript, while the matter of bringing forth his criminal record did not occur until Friday, January 21 at p 303 of the transcript. The court cannot say that counsel for the contestant was not attempting to influence the jury, but does find that he was within bounds and that in any event the two matters were not closely enough related to have any impact standing together. Furthermore, it is the opinion and judgment of this court that neither the reading of the statute nor the remote criminal record, considered separately or considered together, would have had such an impact as to have changed the verdict."

Affirmed. Costs to contestant-appellee.

LESINSKI, C. J., and BURNS, J., concurred.