Ruben Garcia REYES, Appellant,

v.

The STATE of Texas, Appellee.

No. 731–85.

Court of Criminal Appeals of Texas, En Banc.

Nov. 4, 1987.

Joseph A. Connors, III, McAllen, for appellant.

Rene A. Guerra, Dist. Atty., and Theodore C. Hake, Asst. Dist. Atty., Edinburg, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted by a jury of murder under V.T.C.A., Penal Code, § 19.02(a)(1).[1] Punishment was assessed at 99 years' confinement in the Texas Department of Corrections. The Corpus Christi Court of Appeals affirmed the conviction. *Reyes v. State*, 694 S.W.2d 556 (Tex.App.—Corpus Christi 1985, pet. granted). We granted appellant's petition for discretionary review on five grounds to determine the correctness of the Court of Appeals' decision. The grounds for review include the following diverse issues: (1) whether the charge adequately applied the law of parties to the facts; (2) whether appellant's requested converse charge on the law of parties should have been granted; (3) whether an arrest warrant can issue based on facts not shown on the face of the affidavit; (4) whether it is error to allow the prosecutor to read the law of aggravated perjury on cross-examination of a testifying accused; and (5) whether entry of an affirmative finding concerning the use of a deadly weapon was improper where a charge on "parties" was included and no special issue was submitted to the jury.

The record reveals that appellant's fate depended upon whether the jury believed his testimony or the testimony of one of the victims, Joel Villarreal. Joel testified that around 3:00 p.m. on Friday, September 23, 1983, he received a phone call from the appellant's brother, Roel Reyes, who arrived at Joel's house approximately thirty minutes later. Joel had known Roel and the appellant for eight to ten years, and was in fact married to their sister, Laura. Joel opened the door for Roel and testified that "I was getting dressed, and the next thing I know, he [Roel] had a gun to my head." Joel was forced to kneel down at gunpoint. Moments later he was ordered to respond to a knock at the door which resulted in the appellant being admitted into the house. Joel testified that the appellant "went through my drawers and stuff, and found my gun" and that he then "told me to get dressed, that we were

---

1. Appellant was in fact tried and convicted of committing four separate offenses, namely murder, attempted murder, aggravated kidnapping and aggravated robbery. At appellant's request, the four cases were consolidated for trial in a single prosecution. The Court of Appeals affirmed all four convictions, issuing three separate unpublished opinions and one published opinion. See *Reyes v. State*, 694 S.W.2d 556 (Tex.App.—Corpus Christi 1985, pet. granted). Petitions for discretionary review were granted in each case and are currently before this Court for review.

going for a ride." At this point, the three men walked outside and went to Joel's car.

The appellant followed in his own car, while Roel drove Joel's car to the residence of Frank Luna, whom the appellant had allegedly called from Joel's house. Joel testified that "Frank got in the car, and Roel [who had moved to the back seat] put the gun on his head." Joel also stated that the appellant continued to follow them to a gas station, where the following took place:

"Q Okay. Joel now what happened at that gas station?

"A Ruben [the appellant] got down and put gas.

"Q And what did Ruben do or say?

"A Ruben told Roel if any of us moved or tried anything funny, to gut us.

"Q To do what?

"A To gut us.

"Q What does that mean, Joel?

"A Stab us with a knife."

At this point the appellant evidently got into Joel's car and handed Roel an "eight inch knife, dagger-type."

Joel testified that Frank and the appellant argued about "some money that Ruben had come out short." Joel admitted that he had set up a "grass deal" in which the appellant and Frank were to drive to Utah in separate cars to sell fifty pounds of marihuana. Joel also testified to the following:

"Q Was the marihuana sold in Utah?

"A Yes, sir.

"Q Who made the money?

"A Well, because of what was short and stuff, just Frank.

"Q How much money did you make?

"A None. I lost.

"Q How much money did Frank make?

"A Made about $5,000.

"Q How much money did Ruben make?

"A He didn't make any because he was short, but he wasted about 2,000 or 3,000.

"Q How do you know that Ruben was short some money?

"A Because Frank gave him some money in Utah to come home with, and when Frank got back, Frank and I went to Ruben's house, and Ruben admitted that he had counted the money, and he had brought it home, and there was no way Frank would have switched it on him.

\* \* \*

"Q And how much money are we talking about being short?

"A Five thousand dollars.

"Q Did someone short change you, Joel?

"A Yes.

"Q Who shortchanged you?

"A Ruben."

According to Joel, the appellant was also mad at Frank for telling certain people in McAllen that the appellant was short $5,000. Joel stated that although he did not receive any money on the deal, this would not have made him angry enough to frame the appellant by lying in open court.

The group ultimately arrived at Tom Gill Road, where Joel parked his car approximately fifty feet from the road near an abandoned bus. Joel testified that once the men got out of the car, "Ruben took my wallet, my watch, my buckle. Then he—\* \* \*—took Frank's—" Joel also stated that the appellant told Roel: "We're going to make it look like a robbery." Roel bound the hands of both Joel and Frank with some black rope found near the side of the bus. The two were forced to kneel down at gunpoint, and "[t]hen Ruben handed the knife to Roel, and whispered something to Roel."

"Q What happened next?

"A Roel got behind Frank and slit his throat.

"Q Could you describe how that occurred?

"A He walked up behind him, grabbed him from the head, and put the knife to his neck and slit it.

"Q Did you see that?

"A Yes, sir."

Joel then noticed Roel walk over to talk to the appellant, "[a]nd the next thing I know, Roel came out with my 357 and shot me."

Joel suffered a gunshot wound to the neck and testified that before he passed out he heard another gunshot. Joel was later picked up by a couple driving north along Tom Gill Road, who immediately took him to Mission Hospital. Joel testified that he told the couple "that my brother-in-law and his brother had shot me."

Investigator Larry Norris testified that Frank Luna's body was discovered "face down with the hands bound behind the back and an extreme (sic) amount of red substance, which appeared to be blood, about the head and neck area." He also noticed that the body had been cut "from ear to ear on the throat area." Dr. Ruben Santos testified that the cut on the deceased's neck "was superficial" and "not sufficient to have caused massive bleeding." He determined that the cause of death was not the cut to the neck, but rather a "[g]unshot wound to the head." Dr. Santos further stated that the person holding the gun had to be standing behind the victim.

The 32–year–old appellant testified that he graduated from Hitchcock High School in Galveston County and successfully completed a four-year tour of duty in the United States Air Force, receiving an honorable discharge. He had taken some college courses, and was employed as a dispatcher for South Texas Security and Alarm Company. On September 23, 1983, he and Roel drove to Joel's house after Roel had called about buying a gram of cocaine from Joel. Appellant stated that he and Roel were greeted at the door by Joel, who "had a towel around his waist," and that they "just sat down on a couch, and [watched] T.V." Appellant testified that neither he nor Roel carried a firearm into or out of Joel's house.

According to the appellant, Joel asked the two brothers to "accompany him to see some people about that drug deal that happened in Utah." Appellant disputed Joel's version of the Utah drug deal, stating that "I was supposed to pick up some money. That's all." Appellant did not admit to transporting fifty pounds of marihuana to Utah, and in fact said that he was not to make any money from the deal at all. Appellant testified: "The way I had fixed it up with him [Joel], is that I was just going to go up there for a free vacation, and that was it." Consequently, part of the $15,000 appellant said he received from Frank Luna in Utah was allegedly used for travelling expenses for himself and his family.

Appellant corroborated Joel's testimony about driving to Frank Luna's house, where Frank got into Joel's car, leaving the appellant to follow in his own vehicle. Appellant testified that the cars were driven to "a little grocery store," and that Joel made a phone call while the appellant filled his car with gas. Appellant again followed Joel's vehicle, but at State Highway 107 Joel pulled off the road, parked, and signaled for the appellant to get into his car. The appellant said that Joel talked about the Utah drug deal and how they would explain the money shortage to the men they were supposed to meet. Appellant testified as follows about his conversation with Joel:

"A * * *

"I said, 'Well, what do you want me to do? You know, I can't tell them anything, except that I brought fifteen grand down.' He [Joel] says, 'Well, that fifteen grand was five thousand short.' And that's all he was talking about right there at that spot."

The group finally pulled off Tom Gill Road, and according to the appellant "we were just talking about what was going to happen when those guys came."

The appellant testified that "those guys" arrived in a new Bronco with Mexican license plates that read "Frontera, Tamaulipas." Appellant stated that the men carried automatic pistols, and that they initially spoke to Joel and Frank. The appellant noticed that the gunmen spoke "correct Spanish" and he overheard them ask what they (Joel and Frank) planned to do about the money that was owed.

"Q Who were they [the gunmen] saying that to, sir?

"A They were talking to my brother-in-law and Frank.

"Q What, if anything, did your brother-in-law, or Frank, say?

"A They were mostly blaming each other.

"Q In what way?

"A Well, who was responsible for all the money.

"Q Well, do you recall, more or less, what they were saying?

"A The only thing that one of the Mexican men was saying (Spanish phrases).

"THE INTERPRETER: 'We've been waiting a long time, and you owe us $105,000 (sic).'"

Appellant also testified that he asked Joel to tell the gunmen that he had nothing to do with this money, and that Joel complied with his request.

According to the appellant the gunmen then ordered everyone to kneel, however, the appellant only squatted "because my knees bother me sometimes when I get on my knees. "The appellant testified that before the strangers allowed him and Roel to leave the scene, "Joel told me 'You and your brother, are going to Hidalgo and park the car, and you're going to the Comachin (phonetics) Club, in Hidalgo, and wait for me and Frank. We're going to Reynosa, and talk with these people.'" The appellant and Roel then allegedly got into Joel's car, which still had the keys in the ignition, and drove north on Tom Gill Road to pick up the appellant's car which was parked "back on 107." Appellant then drove his car to the "Comachin (phonetics) Club" in Hidalgo around 6:30 p.m. to wait for Joel and Frank, while Roel followed in Joel's car.

After waiting at the club "maybe two hours," the appellant and Roel went to see whether Joel's car was still parked outside the club and discovered that it was gone. The appellant next decided to drive back to Joel's house to return the keys to Joel's wife, Laura, and then he and Roel drove back to his (appellant's) residence. According to the appellant's testimony, he first learned that Joel had been shot from his wife, who had received a phone call notifying her of the shooting. Consequently, the appellant drove his wife to the hospital and then gave Roel a ride to McAllen, before arriving for work "a little after 12:00, I think." Appellant never testified that he ever notified the police about the incident at Tom Gill Road, nor did he explain to his wife what had happened that night. Appellant was arrested at the South Texas Security Company where he worked as a radio dispatcher around 4:00 a.m. on September 24, 1983, for the murder of Frank Luna.

In his sixth ground of review the appellant contends that the trial court erred in overruling his timely objection to permitting the prosecutor to read to him the aggravated perjury statute at the commencement of his cross-examination in the presence of the jury. Appellant contends in his ground of review such ruling violated his constitutional right to present evidence in his behalf and to the presumption of innocence and to a fair and impartial trial.

As earlier noted, the case turned on whether the jury was to believe the version offered by Joel Villarreal, the State's witness, or the version offered by the appellant testifying in his own behalf.

On cross-examination of an investigating officer as to the third statement given by Villarreal to the police in which he revealed for the first time the Utah drug deal, appellant's counsel asked if the officer had advised Villarreal as to the perjury laws of the state. The officer answered he had not.

Appellant took the witness stand and on direct examination contradicted the version given by Villarreal. Immediately thereafter appellant was cross-examined, acknowledged to the prosecutor he was aware of the offenses with which he was charged and for which he was on trial. The record then reflects:

"Q Mr. Reyes, I feel that it is incumbent upon me at this time to also make you aware of Texas Penal Code—

"MR. RAMON: I'm going to object, Your Honor, to Counsel going into any of those matters. At this time, we would like to approach the bench.

"THE COURT: You may, Counsel.

"(Off the record discussion.)

"THE COURT: All right. Let's go.

"Q. (By Mr. Delgado.) Mr. Reyes, as I was saying, I feel that it is incumbent upon me at this time to read to you Section 37.03 of the Texas Penal Code, which is Aggravated Perjury, Subsection (a), 'A person commits an offense if he commits perjury as defined in Section 37.02 of this code,' and 37.02 of this Code defines perjury as, Subsection (1), 'A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning:' Subsection (1), 'he makes a false statement under oath or swears to the truth of a false statement previously made; and

"Subsection (2), 'the statement is required or authorized by law to be made under oath.' Subsection (b) of 37.02: 'An offense under this section is a Class A misdemeanor.'

"Back to Aggravated Perjury: 'A person commits an offense if he commits perjury as defined in Section 37.02 of this code,' previously defined—'and the false statement:' Subsection (1): 'is made during or in connection with an official proceedings, and (2) is material.'

"Subsection (b) of 37.03: 'An offense under this section is a felony of the third degree.' Now, Mr. Reyes—

"MR. RAMON: For the record, Your Honor, we're going to make an objection to this particular Statute. We feel that the District Attorney is now reading into evidence something that is invading the province of this jury. It is up to this jury to determine questions of fact, and what facts are going to be believed. And we feel that by doing this, they're injecting a prejudicial matter that is irrelevant, immaterial, simply designed to inflame the minds of the jury, and it has no bearing on this particular case. At this time, we feel that is grossly improper for them to have done that.

"MR. DELGADO: Your Honor, the State is simply advising this Defendant as to what the law is as to perjury in the State of Texas, Your Honor.

"THE COURT: Let's go forward.

"MR. RAMON: Is my objection overruled, Your Honor?

"THE COURT: Yes, sir.

"MR. RAMON: Note our exception.

"THE COURT: Yes, sir. Let's go forward.

"Q (By Mr. Delgado.) Mr. Reyes, you've testified, and I ask you now if you have anything to change in your testimony?

"A No, not to change, no."

On appeal the appellant's points of error contended "the trial court infringed upon appellant's federal and state constitutional due process rights to a fair and impartial trial by allowing, over objection, the prosecutor to read to appellant in the presence of the jury the Texas aggravated perjury statute, V.T.C.A., Penal Code, Sections 37.02 and 37.03."

The Court of Appeals treated the claim as a claim of a denial of his constitutional rights to be heard and have his testimony treated the same as other witnesses thus depriving him of a fair and impartial trial. The Court of Appeals rejected the contentions, distinguishing *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1971), and observed that appellant had responded, "No, not to change, no" and proceeded to maintain his version of the events and his innocence on cross-examination.

■ The Court of Appeals did not observe the difference between the objection offered at trial and the one presented on appeal. The point of error on appeal must be the same as the objection raised at trial. *Bouchillon v. State*, 540 S.W.2d 319, 322 (Tex.Cr.App.1976). Nothing was presented for review if the "invading the province of the jury" objection at trial is not the same as that urged on appeal.

As earlier observed, the ground of review urges appellant was denied his constitutional right to the presumption of innocence, and his right to present evidence in his behalf depriving him of a fair and impartial trial. Insofar as the ground of re-

view differs from the point of error and the objection at trial the ground of review was improvidently granted.

■ Be that as it may, we will review the trial court's ruling. The reading of the aggravated perjury statute and the question asked on cross-examination came after appellant's counsel had asked an officer-witness if he had informed the State's chief witness, Villarreal, of the perjury laws, and after the appellant, on direct examination, had contradicted Villarreal's version.

It is well established that the scope of cross-examination is subject to the sound discretion of the trial court. *Easterling v. State*, 710 S.W.2d 569, 579 (Tex.Cr.App. 1986); *Saunders v. State*, 572 S.W.2d 944 (Tex.Cr.App.1978); *Toler v. State*, 546 S.W. 2d 290 (Tex.Cr.App.1977), and cases there cited; *Winkle v. State*, 488 S.W.2d 798 (Tex.Cr.App.1972). See also *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed.2d 624 (1931); 62 Tex.Jur.2d, Witnesses, § 861.

And where there is an irreconcilable conflict between the testimony of the prosecution and the testimony of the defendant, considerable latitude should be allowed in cross-examination of the defendant. *Daniels v. State*, 167 Tex.Cr.R. 219, 319 S.W.2d 321 (1959).

It is well established that when a defendant in a criminal case voluntarily takes the witness stand in a trial on the merits on his behalf he occupies the same position and is subject to the same rules as any other witness. He may be contradicted, impeached, discredited, attacked, sustained, bolstered up, made to give evidence against himself, cross-examined as to new matter, and treated in every respect as any other witness, except where there are overriding constitutional or statutory provisions. *Cisneros v. State*, 692 S.W.2d 78 (Tex.Cr. App.1985); *Brown v. State*, 617 S.W.2d 234, 236 (Tex.Cr.App.1981); *Ayers v. State*, 606 S.W.2d 936 (Tex.Cr.App.1980); *Valerio v. State*, 494 S.W.2d 892 (Tex.Cr.App.1973); *Santiago v. State*, 444 S.W.2d 758 (Tex.Cr. App.1969); *Sensabaugh v. State*, 426 S.W. 2d 224 (Tex.Cr.App.1968). See *Jenkins v.*

*Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); 1 Branch's Anno.P.C., 2d Ed., § 168, p. 170; 62 Tex.Jur.2d, Witnesses, § 205, p. 130.

"Thus, when an accused voluntarily elects to so testify he subjects himself to any legitimate cross-examination within the rules of evidence." *Bustillos v. State*, 464 S.W.2d 118 (Tex.Cr.App.1971).

And when the defendant testifies he puts his credibility into issue, *Hughes v. State*, 92 Tex.Cr.R. 650, 245 S.W. 440 (App.1922), and that credibility may be attacked. *Lucas v. State*, 378 S.W.2d 340 (Tex.Cr.App. 1964).

In *Creech v. State*, 168 Tex.Cr.R. 422, 329 S.W.2d 290 (1959), the defendant was asked on cross-examination whether "he would say that the officer was lying, and he answered in the affirmative." This Court noted that the prosecutor's question was improper, but nevertheless stated:

"However, when the appellant said that the officer was lying, he was merely saying that his version of the affair was correct and that of the officer incorrect. We see nothing in such answer which would tend to bring him into disrepute with the jury." *Creech*, supra, 329 S.W. 2d at 291.

And in *Salcido v. State*, 170 Tex.Cr.R. 572, 342 S.W.2d 760 (1961), it was held that overruling the defendant's objection to a question asking him on cross-examination whether a witness to the contrary had told the truth was harmless error, even though the objection should have been sustained.

We have not been cited and have not found a Texas case addressing the reading of a perjury statute to a witness, much less the defendant testifying in his own behalf. Our research has uncovered three out-of-state cases. In *State v. Spotville*, 308 So. 2d 763, 766 (La.1975), it became necessary for the State to attempt to impeach one of its own witnesses. After laying the predicate for doing so, the prosecutor announced before the jury it intended to read the perjury statute to the witness. Defense counsel objected on the ground that this was a badgering of the witness and

everyone was presumed to know the law. His objection was overruled. On appeal the defendant complained such action was error. The Louisiana Supreme Court wrote:

"Perhaps a preferable procedure would have been to have the statute read to the witness outside the presence of the jury. Defendant, however, did not make this request at trial. And even if we were to be concerned that the prosecutor was badgering the witness or implying to the jury that he should not be believed, we would still be inclined to find no prejudice accruing to the defendant. The trial court had already determined that the State could impeach the credibility of its witness by showing prior inconsistent statements, and the State had proceeded to do so. Any possible discrediting of the witness, by reading the perjury statute to him, added nothing to what the State was already attempting to do by leading questions relative to prior inconsistent statement." *State v. Spotville*, supra, at 766.

*Spotville* was cited with approval in *State v. Brown*, 481 So.2d 679, 686 (La. App. [1st Dist.] 1985), which held that it was not reversible error where the prosecutor read the perjury statute to a defense witness. After noting that the defense objection at trial did not comport with those on appeal and did not present anything for review, the court wrote:

"As was concluded in *Spotville*, we find that defendant suffered no prejudice from the prosecutor's reading of the perjury statute to Balonie [the witness]. Herein, as in *Spotville*, the state had already begun impeaching the witness by a prior inconsistent statement; and the possible discrediting of the witness added nothing to what the state had already done by beginning impeachment of the witness. Additionally, the record does not reflect that Balonie was intimidated by the conduct of the prosecutor." *State v. Brown*, supra, at 687.

*In re Estate of Searchill*, 9 Mich.App. 614, 157 N.W.2d 788 (1968), a civil case, involved a will contest. There the trial judge read the perjury statute to all the witnesses in the courtroom, including the witness on the stand, explained it and stated, "This is for the benefit of all the witnesses who are present in the courtroom and for the benefit of the witness on the stand [Fulco]."

The Michigan Court of Appeals wrote:

"It should be noted at the time that Mr. Fulco testified and at the time the perjury statute was read was at a time before he had testified as to most of the material matters of the case. The court fails to see that at the time this occurred there was any prejudice to him or anyone else. At the time the court had no discrepancy in testimony before it given by Mr. Fulco and such discrepancies that did occur in his testimony occurred at a later time. It may very well be that the discrepancy between his testimony in court and his testimony at the time he gave his discovery deposition was the result of the serious consideration given by him to that statute. It seems to the court that a jury would likely believe a man's testimony or place more weight upon it with knowledge that he is aware of the serious consequences of not telling the truth than if he were not aware of it. Counsel for proponent attempts to tie in the reading of the statute with the questions regarding his criminal record.

\* \* \*

"Furthermore it is the opinion and judgment of this court that neither the reading of the statute nor the remote criminal record, considered separately or considered together, would have had such an impact as to have changed the verdict."

"In light of Bryant's evasiveness in responding to the various questions from the prosecutor and in light of the fact that Bryant's direct testimony *squarely* contradicted that of several government witnesses, we believe the district court acted well within its broad discretion in allowing the prosecutor to ask Bryant whether his testimony necessarily meant the testimony of other witnesses was

untrue. [*United States v.*] *Thetford*, 676 F.2d [170] at 183 [ (5th Cir.1982) ]. Moreover, even if the prosecutor's questions invaded the province of the jury, Bryant suffered no prejudice from such questioning. *In each instance, Bryant unequivocally stated that the testimony of the government witness was indeed untrue. We cannot say that Bryant is prejudiced when he is given an opportunity to affirm that contradictory testimony is fallacious.* The error, if any, is harmless." *United States v. Bryant*, supra, 770 F.2d [1283] at 1291, [ (5th Cir.1985) ]. (Emphasis added.)

If it can be said that the matter was preserved for review we cannot conclude that the prosecutor, apparently invited or tempted by earlier action of the defense counsel, committed reversible error, given the circumstances of the case, although the reading of the statute should not have been allowed. The ground of review is overruled.

In his third ground of review the appellant urges the Court of Appeals "erred in overruling appellant's contention that, over timely oral request and objection, the trial court erroneously failed to apply the law of parties to the facts of the case." Appellant refers us in part to his points of error three and four below in which he complained that the trial court erred in overruling his objection that Paragraph III of the charge failed to apply the law of parties to the facts therein and his special requested charge to do so.

The indictment alleged in pertinent part that appellant did

"then and there intentionally and knowingly cause the death of an individual, Francisco Blas Luna, by shooting the said Francisco Blas Luna with a firearm, and by cutting the throat of said Francisco Blas Luna with a knife."

Paragraph III of the court's charge read:

"Now, if you find from the evidence beyond a reasonable doubt that on or about the 23rd day of September, 1983 in Hidalgo County, Texas, the Defendant, RUBEN GARCIA REYES, did intentionally or knowingly cause the death of an individual, FRANCISCO BLAS LUNA, by shooting him with a firearm as set forth in the indictment, then you will find the Defendant, RUBEN GARCIA REYES, guilty of murder as charged in the indictment."

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt as to whether the defendant is guilty of murder, then you will acquit him."

Later in the court's charge in Paragraph VIII the court charged abstractly on the law of parties and then at the suggestion of the appellant applied the law to the facts as follows:

"Each party to an offense may be charged with commission of the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to the crime.

"Therefore, if you believe from the evidence beyond a reasonable doubt that the Defendant either by his own conduct, or acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided or attempted to aid Roel Reyes to commit the offense charged, as defined above, you will then find the Defendant guilty of the offense as charged. If you do not so believe, or if you have a reasonable doubt thereof, you will find the Defendant not guilty."

Later, however, the appellant's counsel objected to the failure to include an application to the law of parties to the facts and submitted a special requested charge in lieu of Paragraph III. The record reflects:

"MR. RAMON: Yes, Your Honor. The Defendant again would object because the Charge in this case fails to apply the law of parties to the facts in

the case. We would request that the Court substitute Paragraph III on Page 1, omit it, and substitute the following instruction, which we would like to dictate at this time.

"Now, if you find from the evidence beyond a reasonable doubt, that on or about the 23rd day of September, 1983, in Hidalgo County, Texas, the Defendant, Ruben Garcia Reyes, *either acting alone, or by soliciting, encouraging, directing, aiding, or attempting to aid,* Roel Reyes, did intentionally or knowingly, cause the death of an individual, Francisco Blas Luna, by shooting him with a firearm, as set forth in the indictment, then you will find the Defendant, Ruben Garcia Reyes, guilty of murder, as charged in the indictment. We feel, Your Honor, that this particular charge that was dictated, properly applies the law of parties to the offense of murder, and that it should be granted, and we ask for a ruling of the Court at this time. "THE COURT: It will be overruled." (Emphasis supplied.)

■ Although an accused is charged by indictment or information and held to answer for doing a criminal act himself, if the evidence supports a charge on the law of parties the court may charge on the law of parties and apply the law to the facts even if there is no such allegation in the indictment or information. *Williams v. State,* 676 S.W.2d 399 (Tex.Cr.App.1984), and cases there cited; *Blanco v. State,* 641 S.W.2d 532 (Tex.Cr.App.1982).

■ A charge on the law of parties is not required, however, when the accused is charged with having committed the criminal offense himself, although the evidence showed another or others took an equal part with him. *Williams v. State,* supra; *Bowers v. State,* 570 S.W.2d 929 (Tex.Cr. App.1978).

When, however, there is no evidence to support the submission that the accused was the primary actor, an instruction on the law of parties should be submitted and made applicable to the facts. *Romo v. State,* 568 S.W.2d 298 (Tex.Cr.App.1978) (Opinion on State's Motion for Rehearing).

In the latter situation, failure to apply the law of parties to the facts of the case constitutes error, if there is a timely and sufficient objection. *Romo,* supra; *Bowers,* supra.

In the instant case the cause of death of Luna was a gunshot wound to the head. Villarreal testified that appellant appeared to be directing the abduction, etc. Appellant took Villarreal's gun from his home, told his brother, Roel, to "gut" Villarreal and Luna if they "tried anything funny," whispered to Roel after handing him a knife just before Roel slit Luna's throat, talked to Roel just before Roel shot Villarreal with his own gun which appellant had originally taken. Villarreal later heard another gunshot and did not know whether appellant or Roel shot Luna. He did not see who did the shooting.

■ What was asked for in appellant's special requested charge was covered by Paragraph III and Paragraph VIII when they are read together. Where the trial judge's instructions encompass the substance of the matters which the defendant desires to have propounded to the jury, failure to give the defendant's specific requested instruction does not entitle the defendant to a reversal. *Debolt v. State,* 604 S.W.2d 164, 168 (Tex.Cr.App.1980); *Thomas v. State,* 578 S.W.2d 691, 698 (Tex.Cr. App.1979); *Sheppard v. State,* 545 S.W.2d 816, 819 (Tex.Cr.App.1977); *Aranda v. State,* 506 S.W.2d 221, 225 (Tex.Cr.App. 1974); *Estrada v. State,* 479 S.W.2d 316, 317 (Tex.Cr.App.1972); *Bridges v. State,* 422 S.W.2d 449, 450 (Tex.Cr.App.1967). See also *Harrison v. State,* 630 S.W.2d 350, 353 (Tex.App.—San Antonio 1982); *LeDuc v. State,* 593 S.W.2d 678, 685 (Tex.Cr. App.1979).

We conclude that when read as a whole, the charge was sufficient to charge the jury on the law of parties and apply the law to the facts.

■ In connection with this ground of review the appellant also seems to argue that the trial court erred in submitting a charge which permitted the jury to convict him on a theory not supported by the evi-

dence, claiming that there was no evidence to support submission on the theory that he was the "primary actor" or acting alone. We note that the above quoted special requested charge would have allowed the jury to find appellant guilty for his conduct "acting alone." Thus appellant even asked for the submission of this theory. Further, the Court of Appeals found that the appellant's failure to object to the charge on this ground or to otherwise apprise the trial court of this complaint was dispositive of the matter. See *Carrillo v. State*, 591 S.W.2d 876, 890 (Tex.Cr.App.1979).

In *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985) (Opinion on State's Motion for Rehearing), this Court wrote:

"After researching Texas statutory and decisional law from 1857 forward, we have concluded that Article 36.19 actually separately contains the standards for *both* fundamental error and ordinary reversible error. If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than that there must be *some* harm to the accused from the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error is not harmless.

"On the other hand, if no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'

"In both situations the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole."

In the instant case since there was no objection the error, if any, was fundamental error although appellant does not so claim in such terms.

In *Watson v. State*, 693 S.W.2d 938 (Tex. Cr.App.1985), it was held that even though the evidence was insufficient to raise the possibility of defendant's acting alone in committing a burglary, the charge, given over objection, that the jury could convict if it found defendant committed the offense of burglary while "acting either alone or as a party to the offense" was harmless error in light of the standard for review of error in the charge under Article 36.19, V.A.C. C.P., as set forth in *Almanza*.

In *Watson*, we stated:

"Although the evidence was insufficient to raise the possibility of appellant's 'acting alone', appellant was not harmed by the presence of that language in the charge. The jury was clearly instructed that before they could return a guilty verdict, they had to find beyond a reasonable doubt that the appellant burglarized the premises while either acting alone or as a party. The evidence presented at trial clearly showed appellant's guilt as a party. A review of the State's jury argument shows that the State was proceeding solely on the theory that appellant was guilty as a party. After carefully reviewing the record, it is inconceivable to us how the jury could have been misled by the court's charge.

"Nor are we able to determine how appellant was harmed by the charge. In *Romo v. State*, 568 S.W.2d 298 (Tex.Cr. App.1978) (Opinion on State's Motion for Rehearing), this Court wrote the following:

" 'A charge on the law of parties enlarges a defendant's criminal responsibility. The charge benefits the State and not the defendant. See *Ransonette v. State*, 550 S.W.2d 36, 42 (Tex. Cr.App.1977).' *Romo v. State*, supra at 302.

Likewise in the converse, a charge requiring the jury to find that a defendant acted alone increases the State's burden and thus benefits the defendant. In the instant case then the State would have had to satisfy a heavier burden in prov-

ing to the jury that the appellant acted alone in committing the burglary. If anything, appellant was helped by the court's charge. We find the error to have been harmless."

In *Carrillo v. State*, 566 S.W.2d 902, 910 (Tex.Cr.App.1978), the defendant alleged that the court's charge was fundamentally defective because it permitted conviction on a theory not supported by the evidence, namely that the defendant acted alone in the commission of the offense. Carrillo's contention was easily disposed of since his objection was raised for the first time on appeal, but the Court nevertheless concluded that Carrillo could not have been harmed by the court's charge.

"The evidence was abundantly clear that appellant did not act alone in the commission of the offense and thus the jury could not have been misled by the inclusion of these three words ('acting alone, or') in a lengthy, eight-page charge. We find no indiction whatsoever that these words were placed in the charge so as to injure the rights of the accused nor do we find from the record that appellant did not have a fair and impartial trial." *Carrillo,* supra, at 911.

2. The prosecutor argued:

"Ruben Garcia Reyes is also charged with the offense of murder. The murder of Francisco Blas Luna. And we told you from the very beginning, ladies and gentlemen, the law of parties. *We're* not saying that this man pulled the trigger. We're not saying that he's responsible for it. We are saying that he ordered the death of Francisco Blas Luna. We are saying that he's the one that is responsible for Francisco Blas Luna not being here today to tell you his story.

\* \* \*

"Both, Mr. Ramon, for the Defense, and I, told you what the law of parties was. The Judge tells you what the law of parties is in the Court's Charge. Read it carefully. Look if it applies.

"Mr. Ramon told you that there was a saying as to what the law of parties is. It's in Spanish. I can't tell you what it is in Spanish, but you all may recall it. 'But each party to an offense may be charged with commission of the offense,' is the way that it is charged, ladies and gentlemen. *That's why Ruben Garcia Reyes is being charged. Not because we know that he's the one that shot Francisco Blas Luna. Joel Villarreal testified that he saw*

Although *Carrillo,* supra, was decided prior to *Almanza,* supra, its rationale still applies, and is in fact strengthened by our recent decision in *Watson,* supra.

In *Almanza* harm analysis it is well settled that a charge must be viewed as a whole to determine whether fundamental error exists, the court's charge must be viewed as a whole. *Inman v. State,* 650 S.W.2d 417 (Tex.Cr.App.1983). This rule also mandates that appellate review not be limited to parts of a charge standing alone. See *Selvage v. State,* 680 S.W.2d 17, 20 (Tex.Cr.App.1984); *Jackson v. State,* 591 S.W.2d 820, 824–25 (Tex.Cr.App.1979); *Pittman v. State,* 554 S.W.2d 190 (Tex.Cr. App.1977); *McElroy v. State,* 528 S.W.2d 831 (Tex.Cr.App.1975).

As earlier noted, the charge adequately instructed the jury on the law of parties. The State's evidence showed that no one saw who shot the deceased, and even though it might be argued that the evidence did not even circumstantially show that appellant did the shooting, the evidence was clearly sufficient to show appellant's guilt as a party. Further, the State's theory throughout the jury argument was that appellant was guilty as a party.[2]

*Roel Reyes slice the throat of Francisco Blas Luna. Joel Villarreal also testified that Roel Reyes shot him, and then, him having been shot, he didn't see who shot Francisco Blas Luna."* (Emphasis added.)

Later, the prosecutor also summarized Joel Villarreal's testimony as follows:

"And then Joel went on to testify that they were the only four that were there. He went on to testify that this Defendant and his brother, escorted them to the back of the bus where they made them both kneel after they had tied their hands with this rope. *And then Roel Reyes sliced Frank Luna's throat.* And then Roel Reyes and this Defendant, went to the bus—went around the bus and whispered something to each other, and Joel Villarreal doesn't know what was said, but he does know that *shortly after Roel Reyes comes with Joel Villarreal's own 357 Magnum and shoots him in the neck, in an attempt to murder Joel Villarreal.* And then seconds later, he doesn't see, but he hears a gunshot wound. Then of course, sometime thereafter, he drags himself to Tom Gill Road, and the Salinas' come by." (Emphasis supplied.)

Finally, the prosecutor concluded by reemphasizing the applicability of the law of parties to the case:

We cannot conclude that the error, if any, was so egregious and created such harm that appellant was deprived of a fair and impartial trial. See *Almanza,* supra. Appellant's ground of review is overruled.

Appellant's first ground for review contends that "the trial court should have submitted a converse charge on the law of parties, and in an affirmative manner submitted appellant's *defense that he was merely present* at the scene of the offense." (Emphasis supplied.)

At the outset it should be observed that appellant testified that he and his brother left the scene where the deceased Luna and Villarreal were with some men apparently from Mexico. He claimed that if an offense occurred he was a non-participant and was at another and different place at the time. The court submitted to the jury appellant's defense of alibi. The State's evidence clearly showed more than mere presence at the time of the offense.

As earlier observed the court charged on the law of parties and instructed the jury that "Mere presence alone will not constitute one a party to the crime."

Nevertheless, the appellant filed a special requested charge as follows:

"You are further instructed that the mere presence of Defendant RUBEN GARCIA REYES at the scene of the murder, if any, of FRANCISCO LUNA, would not constitute the defendant criminally responsible as a party to the offense, if any, and if you should find from the evidence beyond a reasonable doubt that someone other than the defendant did then and there commit the said murder of said FRANCISCO LUNA as aforesaid, but you further find and believe from the evidence, or you have a reasonable doubt thereof, that the Defendant RUBEN GARCIA REYES.

"1) did not at the time and place in question possess an intent to promote or assist the commission by some other person or persons of the murder offense charged in the indictment herein; or

"2) did not agree to or solicit, encourage, direct, aid, or attempt to aid either some other person or persons, in the commission of said murder,

then you will find the Defendant RUBEN GARCIA REYES 'Not Guilty' of the offense of murder as charged in the indictment herein."

The court denied the special requested charge.

Appellant urges that his requested charge was based on the premise that a defendant is entitled to an instruction on every defensive issue raised by the evidence, whether produced by the State or the defendant, and whether it be strong, weak, unimpeached or contradicted. See *Gavia v. State,* 488 S.W.2d 420, 421 (Tex. Cr.App.1972); *Thompson v. State,* 521 S.W.2d 621, 624 (Tex.Cr.App.1974); *Warren v. State,* 565 S.W.2d 931, 933–34 (Tex. Cr.App.1978); *Moore v. State,* 574 S.W.2d 122, 124 (Tex.Cr.App.1978); *Montgomery v. State,* 588 S.W.2d 950, 952 (Tex.Cr.App. 1979); *Lugo v. State,* 667 S.W.2d 144, 146 (Tex.Cr.App.1984); *Booth v. State,* 679 S.W.2d 498, 500 (Tex.Cr.App.1984); *Sanders v. State,* 707 S.W.2d 78, 80 (Tex.Cr.App. 1986).

■ The Court of Appeals in rejecting the contention did not believe the error, if any, was preserved. In this the court was mistaken. Next the court found that if preserved, appellant's request, while "converse" to the court's charge on the law of parties, was not a converse charge on an affirmative defense. The court cited *Hitchcock v. State,* 388 S.W.2d 428 (Tex.Cr. App.1965); *Barton v. State,* 172 Tex.Cr.R. 600, 361 S.W.2d 716 (1962); *Patterson v. State,* 164 Tex.Cr.R. 121, 297 S.W.2d 183 (App.1957).

In *Sanders v. State,* 707 S.W.2d 78 (Tex. Cr.App.1986), it was pointed out that evi-

---

"And I submit to you that if you agree that the State has met its burden in each of these cases, that then you can tell people like Ruben Reyes, and more specifically, tell Ruben Reyes that he doesn't take a life and get away with it in Hidalgo County. Whether he orders it, or actually pulls the trigger, or actually slices the throat, the law of parties covered that. That's what the State wants to tell Ruben Reyes, ladies and gentlemen."

dence which constitutes a defense for the purpose of entitling a defendant to an affirmative charge requires the accused to admit the commission of the offense, but to justify or excuse his actions so as to absolve him of criminal responsibility for engaging in conduct which otherwise constitutes a crime. Further, the *Sanders* court held that if the defendant's alleged defensive theory merely negates an element of the offense no affirmative charge need be given overruling *Stokes v. State,* 126 Tex. Cr.R. 377, 71 S.W.2d 882 (1934), and *Cozby v. State,* 506 S.W.2d 589 (Tex.Cr. App.1974). In *Sanders* it was held that the defendant's testimony claiming defense of good faith purchase of a guitar (shown to have been taken in the burglary) from an unknown Mexican man five minutes before his apprehension while in possession of the guitar, which implicitly denied any participation in burglary, did not constitute an affirmative defense requiring inclusion in the charge to the jury.

■ Appellant urges in part that the trial court erred in failing to submit in an affirmative way his defense that he was "merely present at the scene of the offense." There is no such affirmative defense as "merely present."

Appellant relies upon *Cammack v. State,* 102 Tex.Cr.R. 579, 278 S.W. 1105 (1926), where a murder conviction was reversed because of error in the jury charge. There it was written:

"Appellant further complains of the charge of the court in not charging on the law of principals and his presence at the scene of the homicide, and in effect a failure to charge the jury that, although appellant was at the place of the homicide, if he did not know of the intentions of any of his co-defendants to kill the deceased or to inflict upon him serious bodily injury, and his purpose was only for the purpose of having a friendly talk with the said deceased with reference to rumors and reports against him and his sister,[3] or if they had a reasonable doubt thereof, to acquit him. We think that the appellant's contention and criticism

to the charge of the court is well founded in this particular, and that the court should have charged the jury the converse of the law of, principals, and charged in an affirmative way the appellant's defense, which was clearly raised by his own testimony to the effect that his only purpose was to see and talk to the deceased and to request him to desist from visiting the premises of Calvin Boles in his absence, and was trying to separate them at the time of the homicide, or, if they had reasonable doubt thereof, to acquit him." *Cammack,* supra, 278 S.W. at 1106.

*Cammack* held that the defendant was entitled under the facts to a charge and the converse of the law of principals (now parties) *and* to affirmative submission of his defense which had evidentiary support.

■ Appellant received his charge on the defense of alibi which was supported by his testimony that he was not present when the offense occurred. If appellant was entitled to a converse charge on the law of parties, he was not entitled to the one requested. Further, it is observed that the charge given including "Mere presence alone will not constitute one a party to the crime" was sufficient to adequately protect appellant's rights. See *LeDuc v. State,* 593 S.W.2d 678 (Tex.Cr.App.1980).

■ Applying the *Almanza,* supra, harm analysis, in light of the special requested charge, we find upon considering the entire jury charge, the state of the evidence, and the argument of counsel, etc., that the error, if any, was not "calculated to injure the rights" of the appellant and did not result in harm. The ground of review is overruled.

Appellant in another ground of review complains that the Court of Appeals erred in overruling his contention that "the trial court erroneously overruled and denied appellant's timely motion to suppress and trial objections to all evidence, obtained by executing an invalid warrant of arrest that had been issued without probable cause.

---

**3.** This defensive theory was testified to by the defendant personally.

Much time and effort was needlessly spent on the discussion of the validity of the arrest warrant by the parties and the Court of Appeals given the circumstances of the case. None of the evidence complained about was recovered within the permissible scope of a search incident to a lawful arrest. See *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Appellant was arrested at his place of employment. The items complained of as being seized were an unworkable pistol found in a search of appellant's car, clothes identified as being that of appellant's brother found in a communal trash bin outside appellant's residence, and clothes and thongs given to the police by appellant's wife while they were at appellant's residence. Therefore, even if the arrest warrant was valid, the legality of the "seizure" of the items of evidence complained about would have to rest upon another basis for the items were not found in a search incident to arrest.

The affidavit for the arrest warrant is set out in *Reyes v. State*, 694 S.W.2d 556 (Tex.App.—Corpus Christi 1985) at pp. 562–563. Standing alone, the affidavit is conclusory and does not reflect sufficient probable cause. The Court of Appeals agreed, but found itself not bound by the "four corner rule" and went beyond the affidavit to consider the fact that the issuing magistrate, a Justice of the Peace, had gone to the scene of homicide, and that officer-affiant had given the magistrate verbal information not included within the four corners of the affidavit. The court then found the arrest warrant valid. Such discussion was unnecessary and we do not approve the reasoning. See and cf. *Miller v. State*, 736 S.W.2d 643 (Tex.Cr.App.1987).

Assuming that the arrest warrant was invalid, we turn to the validity of the admission into evidence of the items of which complaint is made.

Officers Larry Norris and Erasmo Bravo testified that after appellant's arrest at his place of his employment, South Texas Security and Alarm Company, where he worked as a dispatcher, that he was given the *Miranda* warnings, and that permission to search his car and his house were requested, and that the appellant was told that he did not have to consent. Officer Bravo stated that a consent to search form was fully explained to the appellant and that the appellant signed such written form consenting to the search of the car and his house. Appellant was described as cooperative and that he willingly gave his car keys to the officers and later accompanied the officers to his house. The officers testified the consent was freely and voluntarily given and that no threats or force were used.

The officers testified that the unworkable pistol was found in appellant's car parked outside his place of employment and that later at the house they found "clothing, a pair of brown work pants, a shirt and a pair of thongs; that additional clothing was found in a communal trash dumpster outside the house which was identified as belonging to appellant's brother.

The 32–year–old appellant, a high school graduate, who had served four years in the armed services and had taken college courses and was working as a security officer, testified that he "thought" the *Miranda* warnings were read to him, but he definitely knew he was advised of his right to silence and right to counsel. He acknowledged that he read the consent form and signed it and gave consent to search his car and his house. He went with the officers to his house, and when they asked what he was wearing on the day in question he related he told them and directed his wife to bring such clothing to the officers which she did after going to the bedroom. If appellant's testimony is true, then the shirt and thongs were recovered in that manner and not by a search of the house by the officers. Appellant did not testify that his consent was coerced or forced.

The basic purpose of the Fourth Amendment, United States Constitution, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials. See *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040

(1967); *Haynes v. State,* 475 S.W.2d 739 (Tex.Cr.App.1971); *Brown v. State,* 481 S.W.2d 106 (Tex.Cr.App.1972). The same is true of Article I, § 9 of the Texas Constitution. See *Kolb v. State,* 532 S.W.2d 87, 89 (Tex.Cr.App.1976). It is well settled that under the Fourth and Fourteenth Amendments of the United States Constitution a search conducted without a warrant issued upon probable cause is *"per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1976); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Davis v. United States,* 328 U.S. 582, 593–597, 66 S.Ct. 1256, 1261–1262,, 90 L.Ed. 1453 (1946); *Zap v. United States,* 328 U.S. 624, 630, 66 S.Ct. 1277, 1280, 90 L.Ed. 1477 (1946). The protections afforded by the Fourth Amendment and Article I, § 9 of the State Constitution may be waived by an individual consenting to a search. *Paprskar v. State,* 484 S.W.2d 731, 737 (Tex.Cr.App.1972); *Allen v. State,* 487 S.W.2d 120 (Tex.Cr.App. 1972); *DeVoyle v. State,* 471 S.W.2d 77 (Tex.Cr.App.1971).

It is well settled that the burden of proof is upon the prosecution to show by clear and convincing evidence that the consent to search was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *Rumbaugh v. State,* 629 S.W.2d 747 (Tex.Cr.App.1982); *Martin v. State,* 610 S.W.2d 491 (Tex.Cr.App.1980); *Kolb,* supra; *Paprskar,* supra. The burden requires the prosecution to show the consent given was positive and unequivocal and there must not be duress or coercion, actu-

al or implied, *Meeks v. State,* 692 S.W.2d 504, 509 (Tex.Cr.App.1985); *Allen v. State,* 487 S.W.2d 120 (Tex.Cr.App.1972). This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *Bumper v. North Carolina,* supra; *Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 267, 65 L.Ed. 654 (1921); *Paprskar,* supra. The fact that a person is under arrest, legally or illegally, does not, in and of itself, prevent a free and voluntary consent from being given. *Meeks,* supra, at 509; *Paprskar,* supra, at 738; *Brown v. State,* 443 S.W.2d 261 (Tex.Cr.App.1969). Custody is simply one of the factors to be considered. *Meeks,* supra, at 509; *Nastu v. State,* 589 S.W.2d 434 (Tex.Cr.App.1979), cert den. 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980).

The question of whether a consent to search was "voluntary" is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte,* supra; *Paprskar,* supra; *Kolb,* supra. See also *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

 When called upon to determine the admissibility of physical evidence obtained by a purported consent which followed some form of illegal police action, the courts have not followed consistently the same approach in characterizing the issue. La Fave, Search and Seizure (A Treatise on the Fourth Amendment), Vol. 2, § 8.2(d), pp. 649–650. Some courts have used the "totality of circumstances" voluntariness test, and on occasions the courts have said the question is whether the consent was the fruit of the prior illegality, using the test from *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[4]

While the two tests are not identical, a proper result may be reached by using either one independently. See La Fave, supra. This Court on occasion has used both tests. See, e.g., *Meeks,* supra, using

---

**4.** "Whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploita- tion of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

the "totality of the circumstances" voluntariness test, and *Armstrong v. State*, 550 S.W.2d 25, 31, 32 (Tex.Cr.App.1977) (Opinion on Rehearing), using the fruits of the poisonous tree test from *Wong Sun,* supra. See also *Luera v. State*, 561 S.W.2d 497 (Tex.Cr.App.1978); *Evans v. State*, 530 S.W.2d 932 (Tex.Cr.App.1975). The better test is, of course, that evidence obtained by the purported consent should not be held admissible unless it is determined that the consent was both voluntary and not an exploitation of the prior illegality. See *La Fave,* supra.

In the Fifth Circuit Court of Appeals the rule is well established that, when attempting to prove voluntary consent to search following an illegal arrest, detention or stop, the Government has a much heavier burden to satisfy than when proving consent to search after a legitimate arrest. *United States v. Ballard*, 573 F.2d 913, 916 (5th Cir.1978); *United States v. Troutman*, 590 F.2d 604, 606 (5th Cir.1979; *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983). And in addition to proving voluntary consent the Government must also establish the existence of significant intervening factors which prove that the consent was sufficiently attenuated from the illegal arrest or stop. *Bretti v. Washington*, 439 F.2d 1042, 1045 (5th Cir.1971, cert. den. 404 U.S. 943, 92 S.Ct. 293, 30 L.Ed.2d 257; *United States v. Melendez-Gonzalez*, 727 F.2d 407 (5th Cir.1984).

In *United States v. Recalde*, 761 F.2d 1448, 1457, 1458 (10th Cir.1985), the court observed that there was no per se rule prohibiting use of evidence obtained after an illegal arrest or seizure, and that a defendant's consent may, under certain circumstances remove the taint of an illegal detention. The court held that when consent is obtained after a break in the causal connection between illegality and the evidence obtained the prosecution must establish a break in the causal connection between the illegality and evidence thereby obtained citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975);

*Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

Some courts in determining whether a voluntary consent was obtained by the exploitation of an illegal arrest have utilized the four facts set forth in *Brown v. Illinois,* supra, although that case involved the admissibility of a confession under the Fifth Amendment rather than a consent to search involving the Fourth Amendment. See *People v. Odom*, 83 Ill.App.3d 1022, 39 Ill.Dec. 406, 404 N.E.2d 997 (1980).

The four factors in *Brown v. Illinois,* supra, are (1) whether *Miranda* [5] warnings were given; (2) the temporal proximity of the arrest and confession (or consent to search); (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct.

■ In the instant case we observe that the *Miranda* warnings were given prior to the consent. The giving of these warnings are an important factor as made clear in *Brown.* See also *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2666, 73 L.Ed. 2d 314, 319 (1982). This factor falls on the State's side of the ledger. The record was not well developed on the temporal proximity of the arrest and the consent to search, but the consent appears to have followed closely on the heels of the arrest. This factor falls on the appellant's side of the ledger. The 32-year-old appellant who had taken college courses and was working as a security officer was told he did not have to consent, and this was in addition to the *Miranda* warnings. Further, he read and signed the written consent to search. The intervening circumstances factor falls on the State's side of the ledger as does the factor involving the purpose and flagrancy of the official misconduct. Here the officers first obtained an arrest warrant from the magistrate and proceeded to execute what they believed to be a valid arrest warrant for a felony. There was no showing that threats were made or any coercive action was taken in order to secure the consent and the signing of the form. It had no "quality of purposefulness" and not an "expedition for evidence" admittedly un-

---

**5.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

dertaken "in the hope that something might turn up." *Brown*, 422 U.S. at 605, 95 S.Ct. at 2262.

We find that the consent was voluntary and not tainted by prior illegal police action. The evidence complained of was properly admitted into evidence.

■ Appellant makes particular complaint about the admission into evidence of a shirt and the thongs taken from his house. As earlier noted, appellant testified that while the officers were at his house they asked about what clothes he was wearing on the date in question, and that he directed his wife to bring such items to the officers, which she did. Further, he admitted he was at the scene of the homicide and left before any offense was committed and that he was wearing his thongs at that time. If it can be said that the items were acquired as a result of a search, it must be remembered that when a defendant testifies and admits he possessed the items in question he forecloses himself from later questioning the legality of the search which uncovered such items. *Wheeler v. State*, 628 S.W.2d 800 (Tex.Cr. App.1982), and cases there cited. See also *Jones v. State*, 680 S.W.2d 499, 503 (Tex. App.—Austin, 1983) (Opinion concurring in part and dissenting in part, Gammage, J.).

The ground of review is overruled.

■ Appellant's next ground for review requests this Court to determine whether the Court of Appeals erred in upholding an affirmative finding by the trial court and entered in the judgment concerning the use and exhibition of a deadly weapon during the commission of the offense. The Court of Appeals pointed out that the jury charge tracked the indictment, which charged appellant with using a firearm to cause the death of Francisco Luna. The Court of Appeals reasoned:

"The verdict of guilty necessarily included a finding that appellant committed murder by use of a firearm.[8] Therefore, the jury's verdict reflects the affirmative finding that a deadly weapon was used in the commission of the offense. *Ex parte Moser*, 602 S.W.2d 530 (Tex.Cr.App.1980). The jury's verdict, based upon both the charge and the indictment, authorized the inclusion in the judgment of a finding on the use and exhibition of a deadly weapon."

"_____

"8 "A firearm is a deadly weapon per se. *Stewart v. State*, 532 S.W.2d 349 (Tex.Cr.App. 1976); TEX.PENAL CODE ANN. § 1.07(a)(11) (Vernon 1974)."

*Reyes*, supra, at 568.

The Court of Appeals also concluded that the Penal Code sections dealing with the law of parties (V.T.C.A., Penal Code, § 7.01 and 7.02) "are applicable to the making of an affirmative finding of the use of a deadly weapon during the commission of an offense." *Reyes*, supra, at 568.

Despite the fact of the allegations of the indictment and that the jury found appellant guilty of murder "as charged in the indictment," no special issue was submitted to the jury and no specific finding as to a deadly weapon was made by the jury as to the use or exhibition of a deadly weapon by the appellant during the commission of the offense. It was the trial judge who made the finding and entered it in the judgment. Most important here is to remember that the State's theory of the case was that appellant was guilty as a party.

To the trial court's finding appellant's counsel addressed the following objection.

"MR. RAMON: —at this time in this particular case, there was—the Defendant was convicted under the law of parties. The evidence overwhelmingly showed that Roel, if anyone at all, Roel Reyes was the one that shot Mr. Luna and not this Defendant. The State argued, voir dired on the law of parties. There was no special issue submitted to this jury regarding the use and exhibition of a deadly weapon by Mr. Reyes. For all these particular reasons, we would make a formal objection at this time.

"THE COURT: All right. The objection is overruled at this time."

Since the Court of Appeals' decision, a number of opinions have been handed down making clear that if the guilt of the defendant is as a party then there must be a specific finding by the trier of facts that the defendant personally used or exhibited

a deadly weapon in order that an affirmative finding be supported. *Travelstead v. State*, 693 S.W.2d 400, 402 (Tex.Cr.App. 1985); *Terry v. State*, 692 S.W.2d 496 (Tex. Cr.App.1985); *Flores v. State*, 690 S.W.2d 281, 283 (Tex.Cr.App.1985); see also *Polk v. State*, 710 S.W.2d 610, 613 (Tex.App.— Dallas 1986, no writ); *Zaiontz v. State*, 710 S.W.2d 152, 155 (Tex.App.—Corpus Christi 1986, no writ). In *Travelstead*, supra, at 402, this Court noted the following:

"When a defendant is a party, as defined in Sections 7.01 and 7.02 of the Penal Code, to the use or exhibition of a deadly weapon, there must be a specific finding by the trier of facts that the defendant himself used or exhibited the deadly weapon. The power of the trial court to make an affirmative finding should only be invoked if he is the trier of the facts. When the issue of punishment is before the jury, the trial court should submit a special issue to the jury regarding an affirmative finding of a deadly weapon. Much confusion would be eliminated if this procedure were followed. Additional guidelines have been set out in a case decided this day. *Polk v. State*, 693 S.W. 2d 391 (Tex.Cr.App.1985)."

Article 42.12, § 3f(a)(2), states, in part: "Upon affirmative finding that the *defendant* used or exhibited a deadly weapon during the commission of an offense or during immediate flight therefrom, the trial court shall enter the finding in the judgment of the court."

In view of the evidence, the State's reliance upon the theory of parties for conviction, and the absence of a specific finding by the trier of facts, the jury, we sustain appellant's ground of review. The judgment will be reformed to delete therefrom the affirmative finding as to the use of a deadly weapon by the trial court.

As reformed, the judgment of the Court of Appeals is affirmed.

CLINTON, TEAGUE, MILLER and DUNCAN, JJ., concur.