Reversed and Remanded and Majority and Dissenting Opinions filed July
24, 2007








Reversed and
Remanded and Majority and
Dissenting Opinions filed July 24, 2007.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00154-CR

____________

 

ADRIAN DEWAYNE GREEN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause No. 1021417

 



 

M A J O R I T Y   O P I N I O N

Appellant Adrian Dewayne Green was convicted by a jury of
murder and his punishment assessed at fifty years= confinement in
the Texas Department of Criminal Justice, Institutional Division, and a $10,000
fine.  On appeal, appellant complains of errors in the court=s charge and its
instructions to the jury.  Because we find reversible error in the jury charge,
we reverse and remand for a new trial.

I.        Factual
and Procedural Background

Appellant and his younger brother, Jermarxian Deandre
Green, were each charged by indictment with the murder of Quinton Kelegon, the
complainant.  The two were tried together as co-defendants before the same
jury.  The jury found appellant guilty of murder and found Jermarxian guilty of
manslaughter.[1] 


A.      The
Evidence Presented at Trial

Some time before 2:00 a.m. on March 13, 2005, Kelegon and
three friends, Desonyeigh Dwayne Hooper, Lebroderick Williams, and Christopher
Pope, decided to go to Carrington=s, a nightclub
located in a strip mall on South Main inside Loop 610.  They arrived near
closing time in Hooper=s vehicle, a 1990 Chevrolet Caprice
Classic, and parked in the parking lot Carrington=s shares with
other businesses.  The group did not go inside Carrington=s, but instead
walked around the parking lot socializing and looking at girls. 

Also parked in the same parking lot was an orange or
tangerine colored, customized Ford Expedition owned by appellant.[2] 
Appellant, a local rapper, and his younger brother, Jermarxian Deandre Green,
were promoting appellant=s music CDs from the Expedition.  

Eventually, as people began leaving the club, Kelegon and
his friends decided to leave the parking lot.  Hooper was driving the Caprice
and Kelegon sat in the front passenger seat.  Williams and Pope were seated in
the back, with Pope behind Hooper and Williams behind Kelegon.  








At this point, the facts developed at trial by the State=s witnesses
Hooper, Williams, and Pope differ in various details and diverge significantly
from those of the defense.  The State=s witnesses
testified generally that after they left the club=s parking lot they
stopped at a red light at South Main and Westridge.  At that time, they were
playing music in the Caprice from a CD entitled ATha Boss,@ by rapper Slim
Thug.  Thug=s music talked Aabout rappers@ and some of it
included Avery unflattering@ and Anegative@ references to
appellant=s rap music.  

Appellant, driving the Expedition, with his brother
Jermarxian as passenger, pulled up on the passenger side of the Caprice. 
According to the State=s witnesses, appellant could hear the
music and became angry, and he and Kelegon, in the front passenger seat of the
Caprice, exchanged words.  Appellant appeared Ariled up,@ and Avery angry@ toward Kelegon
and Hooper, the driver.  Pope testified that appellant said to Kelegon, ADo you know me?= and Kelegon
responded with ANo, I don=t know you.  Do
you know me?,@ which they repeated back and forth several times.[3] 
When Kelegon saw appellant displaying an unloaded semiautomatic pistol, he told
Hooper that appellant had a gun and said, A[L]et=s go.  Dude got a
pistol, he show it on the steering wheel, let=s go.@  At the next red
light, the Expedition pulled up next to the group on the driver=s side of the
Caprice, and Hooper saw Jermarxian Green in the passenger seat Abent down low@ and Alooking like he
was loading a pistol.@  Hooper ran the red light, and he heard a
shot fired.  Hooper, Williams, and Pope all testified that no firearms were in
or fired from the Caprice.[4]








Hooper drove onto the 610 freeway heading north.  The Expedition
followed, pulled up alongside the passenger side of the Caprice, and several
shots were fired at the Caprice.  A bullet grazed Kelegon=s leg, and he
exclaimed, AMy leg is burning; it=s shot.  This dude
shot me.@  Then, as the two
cars sped along the freeway, the Expedition pulled up toward the driver=s side of the Caprice,
and more shots were fired.  One of the bullets shattered the driver=s side rear door
window of the Caprice and hit Kelegon in the side of the head.  Hooper exited
the 610 Loop at Evergreen, and drove Kelegon to a hospital, where Kelegon later
died. 

The hospital contacted the Houston Police Department, and
Officer A.G. Riddle of the Homicide division and several others investigated
the incident.  Riddle examined the Caprice and determined that there were seven
fresh gunshot strikes in the vehicle, including four to the passenger side and
three to the driver=s side of the vehicle.  He also determined
that all of the shots were fired at angles from the rear of the vehicle toward
the front.  Riddle found no evidence indicating a firearm had been fired from
inside the Caprice.  The police attempted to locate, but never found, the
Expedition.

An autopsy was performed on Kelegon=s body by Dr. Morna
Gonsoulin, an assistant medical examiner with the Harris County Medical
Examiner=s Office. 
Gonsoulin determined that the cause of Kelegon=s death was a
gunshot wound to the head.  The bullet entered behind and slightly above the
left ear, and exited on the right side of the temple.  The bullet traveled from
left to right, slightly back to front, and slightly downward.[5] 
She also found a superficial abrasion on Kelegon=s right leg. 
Gonsoulin testified that Kelegon was pronounced dead at 1:30 p.m. on March 13,
2005.








Herbert Thompson, Jr., a friend of Jermarxian Green who was
called by the State, testified that he saw Jermarxian some time after the
incident and spoke to him about it.  Thompson testified that Jermarxian told
him that he and appellant had been to Carrington=s that night and
that they were in the Expedition when the shooting occurred.  Thompson could
not remember whether the reason Jermarxian gave for the incident was that he
and his brother were being robbed or whether it was that they were being
carjacked.  Thompson testified that Jermarxian believed he had fired the fatal
shot, and appeared remorseful.

Appellant did not testify at trial, but Jermarxian
testified in his defense.  Jermarxian=s version of
events differed significantly from those of the other witnesses to the
incident, particularly concerning who were the aggressors.  Jermarxian was with
appellant, his older brother, on March 13, 2005, to help appellant promote his
CD.  Appellant was a local celebrity and owned the Expedition.  Appellant drove
the Expedition that night.

When Jermarxian and appellant got to the traffic light at
South Main and Westridge, the Caprice pulled up to the driver=s side of the
Expedition and Kelegon twice said to appellant, ADo you know me?,@ and appellant
responded, AI don=t know you.@ Kelegon then said,
AWell, you know
what time it is,@ but appellant did not say anything in
response.  As they were still waiting at the light, Kelegon then got out of the
Caprice, and Jermarxian saw that Kelegon had a gun.  Jermarxian interpreted
Kelegon=s statements and
actions to mean that the occupants of the Caprice were attempting to carjack
them.  Appellant then sped towards the 610 Freeway, but the Caprice caught up
to the Expedition.  Appellant told Jermarxian to hand appellant his gun, which
appellant said was in the console of the Expedition.  Jermarxian handed the gun
to appellant, who told Jermarxian to get down. 

As the Caprice pulled up to the Expedition, appellant began
shooting.  Then, as the Caprice came around to the passenger side of the
Expedition, Jermarxian told appellant to give him the gun.  Jermarxian shot
twice at the Caprice, not aiming at anyone or intending to kill anyone, but
just Ato get those guys
off of us.@  He saw one of the bullets shatter the back driver=s side rear
window.  Jermarxian believed that this shot killed Kelegon. 








Jermarxian admitted that four people rode in the Caprice
because he could see them. He acknowledged that firing a loaded weapon at a car
full of people was an act clearly dangerous to human life.  Although Jermarxian
acknowledged that seven bullet holes were found in the Caprice, he claimed he
had done nothing wrong because Kelegon and the others were trying to rob him
and he was trying to protect himself.  He agreed that the forensic testimony
showed the bullets traveled from the rear of the Caprice toward the front, but
he would not agree that he and appellant were behind the Caprice when the shots
were fired into it.  Instead, he claimed he shot twice when the Caprice pulled
alongside the Expedition and was dead even with it.  After the incident, he
inspected the Expedition and found no bullet holes.

B.      The Court=s Charge at the
Guilt-Innocence Stage 

Appellant=s complaints only concern the charge.  As
a result, we will review it in detail.  

The indictment in relevant part alleged in separate
paragraphs that appellant (1) intentionally and knowingly caused the
complainant=s death by shooting him with a deadly weapon, namely a
firearm, and (2) intended to cause serious bodily injury to the complainant and
caused his death by intentionally and knowingly committing an act clearly
dangerous to human life by shooting him with a deadly weapon, namely a
firearm.  See Tex. Penal Code
'' 19.02(b)(1) &
19.02(b)(2).  The trial court conducted a charge conference at the conclusion
of the evidence at the guilt-innocence stage of the trial.  Appellant=s trial counsel
objected to the charge only on the basis that it did not include the offense of
manslaughter as a lesser-included offense of murder.  The trial court agreed to
include this instruction in the charge.

As finalized, the charge included several standard
definitions and instructions to the jury, including the following instructions
on the law of parties:

All persons are parties to an offense who are guilty
of acting together in the commission of the offense.  A person is criminally
responsible as a party to an offense if the offense is committed by his own
conduct, by the conduct of another for which he is criminally responsible, or
by both.

A person is
criminally responsible for an offense committed by the conduct of another if,
acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense.  Mere presence alone will not constitute one a party to an
offense.  








These
instructions are consistent with the language of sections 7.01(a)(1) and
7.02(a)(2) of the Penal Code addressing parties to an offense.  

However, in the application paragraphs, which immediately
followed the above instructions on the law of parties, the trial court
submitted the offense of murder to the jury as follows:

Now, if you find from the evidence beyond a
reasonable doubt that on or about the 13th day of March, 2005, in Harris
County, Texas, the defendant, Adrian Dewayne Green, did then and there
unlawfully, intentionally or knowingly cause the death of Quinton Kelegon, by
shooting Quinton Kelegon with a deadly weapon, namely, a firearm; or if you
find from the evidence beyond a reasonable doubt that on or about the 13th day
of March, 2005, in Harris County, Texas, Jermarxian Deandre Green, did then and
there unlawfully, intentionally or knowingly cause the death of Quinton
Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm;
or 

If you find from
the evidence beyond a reasonable doubt that on or about the 13th day of March,
2005, in Harris County, Texas, the defendant, Adrian Dewayne Green, did then
and there unlawfully intend to cause serious bodily injury to Quinton Kelegon,
and did cause the death of Quinton Kelegon by intentionally or knowingly
committing an act clearly dangerous to human life, namely by shooting Quinton
Kelegon with a deadly weapon, namely, a firearm; or if you find from the
evidence beyond a reasonable doubt that on or about the 13th day of march 2005,
in Harris County, Texas, Jermarxian Deandre Green, did then and there
unlawfully intend to cause serious bodily injury to Quinton Kelegon, and did
cause the death of Quinton Kelegon by intentionally or knowingly committing an
act clearly dangerous to human life, namely by shooting Quinton Kelegon with a
deadly weapon, namely, a firearm, and that the defendant, Adrian Dewayne Green,
with the intent to promote or assist the commission of the offense, if any,
solicited, encouraged, directed, aided or attempted to aid Jermarxian Deandre
Green to commit the offense, if he did, then you will find the defendant guilty
of murder, as charged in the indictment.

Following
these application paragraphs, the charge provided the following:








You are further
instructed that before a person can be guilty of murder he must have
intentionally or knowingly caused the death, or he must have intended to cause
serious bodily injury and have intentionally or knowingly committed an act
clearly dangerous to human life that caused the death of the deceased.  Unless
you find beyond a reasonable doubt that the defendant is guilty of murder, or
if you  have a reasonable doubt thereof, you will acquit the defendant of
murder and next consider whether the defendant is guilty of manslaughter.

The
jury was also charged on manslaughter, both as a principal and as a party, and
on self-defense.  The jury returned a general verdict finding appellant guilty
of murder.

II.       Analysis
of Appellant=s Issues

A.      Appellant=s Issues

Appellant does not challenge the legal or factual
sufficiency of the evidence supporting his conviction; all of his issues are
directed to the trial court=s charge as submitted to the jury.  As
briefed, appellant contends the trial court reversibly erred by (1) submitting
the question of his criminal liability for murder as a principal on
insufficient evidence; (2) allowing the jury to convict him for the murder
committed by his brother, Jermarxian Deandre Green; (3) failing to instruct the
jury that it must agree on the specific criminal conduct appellant committed
that justified a guilty verdict of murder; and (4) failing to instruct the jury
that it must agree on the predicate offense of Jermarxian Green that justified
finding appellant a party to his crime.  

B.      Standard of
Review

In reviewing jury charge error, we undertake a two‑step
process.  See Hutch v. State, 922 S.W.2d 166, 170B71 (Tex. Crim.
App. 1996).  First, we must determine whether error exists in the charge.  See
id. at 171.  Second, we review the record to determine whether sufficient
harm was caused by the error to require reversal of the conviction.  See id.

The degree of harm necessary for reversal depends on whether
the error was preserved.  Id.  An error properly preserved by an
objection must be reversed unless it is harmless.  Almanza v. State, 686
S.W.2d 157, 171 (Tex. Crim. App. 1984).  However, when the charging error is
not preserved, reversal is not required unless the harm is egregious.  Id.








In determining whether error is egregious, we consider the
following factors: (1) the entirety of the jury charge; (2) the state of the
evidence; (3) the arguments of counsel; and (4) any other relevant information
revealed by the trial record as a whole.  See Sanchez v. State, 209
S.W.3d 117, 121 (Tex. Crim. App. 2006); Almanza, 686 S.W.2d at 171. 
Errors which result in egregious harm are those which affect the very basis of
the case, deprive the defendant of a valuable right, or vitally affect a
defense theory.  Sanchez, 209 S.W.3d at 121; Almanza, 686 S.W.2d
at 172.  In other words, the error must have been so harmful that the defendant
was effectively denied a fair and impartial trial.  See Almanza,
686 S.W.2d at 172.  Egregious harm is a difficult standard to prove and must be
determined on a case‑by‑case basis.  See Hutch, 922 S.W.2d
at 171.

C.      The Trial
Court Reversibly Erred by Instructing the Jury that It Could Convict Appellant
of Murder If It Found that Appellant=s Brother Committed
Murder.

We begin with appellant=s second issue
because that issue disposes of the appeal. In his second issue, appellant
contends the trial court reversibly erred by instructing the jury that it could
find appellant guilty of murder if it found beyond a reasonable doubt
that AJermarxian Deandre
Green[] did then and there unlawfully, intentionally or knowingly cause the
death of Quenton Kelgon with a deadly weapon, namely a firearm.@ (emphasis added) 
Appellant contends that this language, lacking the party language that usually
accompanies this type of instruction, charged the jury that it could convict
appellant of murder if it found that his brother committed murder.  Among other
things, appellant contends this portion of the charge allowed him to be
convicted for conduct that is not an offense and without requiring the jury to
find the elements of party responsibility.  We agree.  We also find that the
error caused appellant egregious harm.

1.       The Charge
Error

The charge as submitted authorized the jury to convict
appellant of murder if it found beyond a reasonable doubt that








$                  
Adrian Dewayne
Green, did then and there unlawfully, intentionally or knowingly cause the
death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon,
namely, a firearm; or

$                  
Jermarxian
Deandre Green, did then and there unlawfully, intentionally or knowingly cause
the death of Quinton Kelegon, by shooting Quinton Kelegon with a deadly weapon,
namely, a firearm;
or

$                  
Adrian Dewayne
Green, did then and there unlawfully intend to cause serious bodily injury to
Quinton Kelegon, and did cause the death of Quinton Kelegon by intentionally or
knowingly committing an act clearly dangerous to human life, namely by shooting
Quinton Kelegon with a deadly weapon, namely, a firearm; or

$                  
Jermarxian
Deandre Green, did then and there unlawfully intend to cause serious bodily
injury to Quinton Kelegon, and did cause the death of Quinton Kelegon by
intentionally or knowingly committing an act clearly dangerous to human life,
namely by shooting Quinton Kelegon with a deadly weapon, namely, a firearm, and
that the defendant, Adrian Dewayne Green, with the intent to promote or assist
the commission of the offense, if any, solicited, encouraged, directed, aided
or attempted to aid Jermarxian Deandre Green to commit the offense.








The
instruction italicized above was intended to offer the jury the option of
convicting appellant of murder as a party, but the party language was omitted
from that particular instruction (although it was included in the serious
bodily injury instruction).  Consequently, the jury was not instructed that, to
find appellant guilty as a party to the murder Jermarxian committed, it had to
find that appellant Awith the intent to promote or assist@ in the commission
of the offense, Asolicited, encouraged, directed, aided or
attempted to aid@ Jermarxian in committing murder.  See
Tex. Penal Code ' 7.02(a)(2).[6] 
Thus, as the charge was presented, appellant could be found guilty of murder
based solely on his brother=s conduct.  Because the charge is the
instrument by which the jury convicts, the charge must contain an accurate
statement of the law and must set out all the essential elements of the
offense.  Dinkins v. State, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). 
A jury charge is fundamentally defective if it omits an essential element of
the offense or authorizes conviction on a set of facts that do not constitute
an offense.  Zuckerman v. State, 591 SW.2d 495, 496 (Tex. Crim. App.
1979).  

This case is like Zuckerman v. State, in which
separately-indicted codefendants were tried together for the offense of
burglary of a habitation.  See id. at 496.  The charge authorized the
jury to convict the appellant for burglary if it found that his co-defendant
was the guilty party, without a finding that the appellant was guilty as a
party to the offense.  Id.  As the Court explained:

It is essential to
a conviction for any offense that the accused be criminally responsible either
because it is committed by his own conduct or by the conduct of another for
whom he is criminally responsible. . . . In this case the jury was authorized
to convict appellant on a finding that his co-defendant committed the offense,
without a finding that appellant personally committed the offense, or that he
was criminally responsible for the acts of his co-defendant.  It thus
authorized conviction on a set of facts that would not constitute an offense for
which he was criminally responsible.  As such, the jury charge is fundamentally
defective.

Id.  Similarly, the
jury here was authorized to convict appellant of a murder committed by someone
else without a finding that he was guilty as a party to the offense.  That was
error.  See id.

The State concedes only that the charge Acould have been
better worded,@ and argues that when read as a whole the charge Aconveys the
message@ that the jury
must apply the law of parties before it would be authorized to convict
appellant for the offense of murder as a party to Jermarxian Green=s conduct.  For
this proposition, the State relies on Reyes v. State, 741 S.W.2d 414
(Tex. Crim. App. 1987).  








However, Reyes is distinguishable.  There, the
defendant contended the trial court erred in refusing to include a requested charge
applying the law of parties to the facts of the case.  Id. at 423B24.  Although the
application paragraph of the court=s charge did not
include a parties instruction, the charge did include, at the defendant=s request, an
abstract instruction on the law of parties that also applied the law to the
facts of the case.  Id. at 423.  Based on this, the Court of Criminal
Appeals held that, when read as a whole, the trial court=s instructions Aencompass[ed] the
substance@ of the defendant=s request and was
therefore sufficient to charge the jury on the law of parties and apply the law
to the facts.  Id. at 424. 

This charge does not do that.  This charge contains an
abstract instruction on the law of parties, but does not contain any
instruction applying this law to Jermarxian=s conduct in the
complained-of paragraph.  Thus, unlike the Reyes jury, this jury was
given no guidance whatsoever concerning how it should apply the law of parties
to Jermarxian=s conduct.  This was error.  But before we can
reverse, we must determine if the error caused appellant egregious harm
requiring reversal and remand for a new trial.[7]


2.       Egregious
Harm Review

To determine egregious harm, Almanza and its progeny
instruct that we may consider not only the erroneous portion of the charge, but
also other relevant aspects of the trial.  See Sanchez, 209 S.W.3d at
121; Hutch, 922 S.W.2d at 171; Almanza, 686 S.W.2d at 171.  As
noted above, these relevant aspects include: (1) the entirety of the charge
itself; (2) the state of the evidence including contested issues and the weight
of the probative evidence; (3) the arguments of counsel; and (4) any other
relevant information revealed by the trial record as a whole.  See Sanchez,
209 S.W.3d at 121.

a.       The
Charge








We first consider the entirety of the jury charge.  See
Sanchez, 209 S.W.3d at 121.  Absent evidence to the contrary, we must
presume that the jury understood and followed the court=s charge.  See
Hutch, 922 S.W.2d at 172.  The jury was instructed that A[y]ou are the
exclusive judges of the facts proved, of the credibility of the witnesses and
the weight to be given their testimony, but the law you shall receive in
these written instructions, and you must be governed thereby.@ (emphasis added) 
In short, the jury was expressly instructed to follow the law as presented in
the charge.

The jury was abstractly charged on the law of parties,
meaning that the charge generally instructed the jury that a person can be
criminally responsible for the actions of another if the person solicits,
encourages, directs, aids, or attempts to aid another in committing an
offense.  But, of utmost importance here, the application paragraphCthe paragraph that
authorizes the jury to accept or reject a specifically alleged offenseCfor murder as a
party omitted the party language.  Taken together, these instructions were
inadequate, for, between the abstract instruction and the application paragraph
on murder as a party, neither specifically explained to the jury which facts it
could properly consider to convict appellant as a party.  In fact, the
instructions were worse than that because, rather than merely withholding
information from the jury, the application paragraph affirmatively misled the
jury by telling the jury it could convict appellant for a murder committed by
Jermarxian GreenCeven if appellant was not a party to the
murder.  This was a legally incorrect instruction that completely misstated the
law, and to worsen matters, we cannot tell if the jury convicted appellant as a
party based on the legally incorrect instruction or as a principal.  See id.
at 171B73; Guevara v.
State, 191 S.W.3d 203, 207 (Tex. App.CSan Antonio 2005,
pet. ref=d) (holding that
instructing the jury on a legal duty theory when appellant had no legal duty to
prevent the commission of the offense was error); see also Campbell v. State,
910 S.W.2d 475, 477 (Tex. Crim. App. 1995) (stating it is error for a trial
judge to refer to the law of parties in the abstract portion of the jury charge
and not to apply that law or to refer to that law in the application paragraph
of the charge).  We cannot assume the jury realized that the parties language
was erroneously omitted, inserted appropriate language, and then applied it
correctly.

b.       The
Evidence

Next, we consider the evidence, including the contested
issues and the weight of the probative evidence.  See Sanchez, 209
S.W.3d at 121.  The State offered the accounts of Kelegon=s companions,
Hooper, Williams, and Pope, to demonstrate that the group of young men were out
for a night of socializing by going to the parking lot of a nightclub to hang
out and look at girls.  Appellant and his brother happened to be promoting
appellant=s rap CDs in the same parking lot, and as the group
was leaving in their Caprice, appellant heard rap music coming from the car
that referred to appellant=s rap music in a derogatory way. 
Appellant then became angry and confrontational, and when he presented a gun,
the group tried to speed away as appellant and his brother chased them in
appellant=s Expedition.  The evidence showed that the Caprice
sustained numerous bullet holes, while there was no evidence that anyone in the
Caprice had a weapon or fired it at appellant and his brother.  

In contrast to the State=s account of the
incident, appellant=s brother Jermarxian testified he saw
Kelegon get out of the car with a gun, and, based on Kelegon=s threatening
statements and conduct, he believed the group was attempting to carjack the
Expedition.  According to Jermarxian, he and appellant tried to drive away from
the Caprice, but the Caprice chased the Expedition and eventually pulled up
next to it.  He admitted that both he and appellant fired appellant=s gun at the
Caprice, but he testified that he was shooting at the Caprice only to Aget them off@ of them.  He also
testified that he believed he fired the shot that killed Kelegon.  








Thus, the contested issues included whether appellant or
Jermarxian fired the fatal shot and whether the conduct was intentional or
knowing, or merely reckless.  The jury could have believed that Jermarxian
murdered Kelegon and that appellant was a party to Jermarxian=s conduct. 
Conversely, the jury could have believed that appellant fired the fatal shot
and Jermarxian was a party to appellant=s conduct. 
Alternatively, if the jury believed Jermarxian=s testimony and
disbelieved the State=s witnesses, it could have determined that
appellant and his brother acted only in self-defense.  Thus, the parties fully
joined the contested issue of appellant=s guilt as either
a primary actor or as a party to murder.

The State argues that any error in charging on the law of
parties was Anecessarily@ harmless because
the evidence Aclearly supported a finding that appellant was
responsible for the complainant=s murder as a primary actor.@  See Cathey v.
State, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (AEven where proper
objection is made at trial, we have held that where, as in the instant case,
the evidence clearly supports a defendant=s guilt as the
primary actor, error in charging on the law of parties was harmless.@); see also
West v. State, Nos. 03-05-00206-CR, 03-05-00207-CR & 03-05-00208-CR,
2006 WL 2449856, at *10 (Tex. App.CAustin Aug. 25,
2006, pet. ref=d); Evans v. State, No. 14-98-0705-CR, 2000 WL
854859, at *2 (Tex. App.CHouston [14th Dist.] June 29, 2000, pet.
ref=d).  However, none
of these cases involved a situation, as we have here, in which an application
paragraph authorized the defendant=s conviction based
on the conduct of the co-defendant.  And, in any event, whether appellant or
his brother were guilty of murder was disputed, and appellant=s brother,
Jermarxian, was
convicted of a lesser offense even though he testified that he believed he fired the
shot that killed the complainant.  Therefore, we do not consider these cases
dispositive of the question whether egregious harm was shown. 

c.       The
Jury Arguments

Finally, we consider the arguments of counsel.  See
Sanchez, 209 S.W.3d at 121.  At closing, Mr. Leitner, Jermarxian=s defense counsel,
spoke first.  He began by emphasizing the jury=s duty to apply
the law to the evidence.  Among other things, he stated that A[t]he Court=s Charge is the
law@ and that it is Abased on exactly
what the statutes say and the Judge has set those forth in the charge.@  He then went
through the charge, explaining the various paragraphs, but he did not mention
the erroneous paragraph specifically.  Counsel then discussed the perceived
inconsistencies in the State=s witnesses= testimony, and
urged the jury to consider Jermarxian Green=s testimony.  








Appellant=s defense counsel, Mr. Barr, then made his
closing statement.  Like Mr. Leitner, Mr. Barr also urged the jury to consider
the perceived inconsistencies and weaknesses in the State=s witnesses= testimony,
Jermarxian=s testimony, and the law of self-defense.  He also
questioned the evidence concerning the positions of the vehicles and the
trajectory of the bullets, and argued that the bullets fired from the
Expedition could have gone into the Caprice Afrom various
angles.@  Although it is
unclear from the context, this argument could have been directed either to
whether it was appellant or Jermarxian who fired the shot that killed Kelegon,
or whether the Expedition was chasing the Caprice or the Caprice was chasing
the Expedition.  Finally, Mr. Barr urged that the evidence did not support a
finding of guilt.

The prosecutor, Ms. Bennett, spoke last.  She discussed the
evidence presented by the State=s witnesses.  Significant to our analysis,
she then argued that A[appellant] was only able to hit [Kelegon]
in the leg and the medical examiner confirmed that.@  Continuing, she
stated, AJermarxian hit the
jackpot.  He fired the gun through the back window and he killed [Kelegon].@  Later, when
discussing the physical evidence, Ms. Bennett stated, 

Then there=s the shot that Jermarxian took,
the one that killed [Kelegon], fired through the back window, that went
directly through the passenger compartment and struck the victim in the head. 
Dr. Gonsoulin confirmed that=s the angle it had taken.

* * *

They are both
equally guilty.  Jermarxian may have fired the killing bullet, but [appellant]
here certainly did his part.  He chased them down.  He tried to kill them,
tried to shoot them, tried to commit serious bodily injury.  He just wasn=t as good a shot
as his brother.  He can only hit him in the leg.

Thus, during her closing argument, the prosecutor urged
that the evidence supported a finding that Jermarxian was guilty of murder for
firing the fatal shot and that appellant was equally guilty because he gave
Jermarxian the chance to shoot and kill.  The charge for its part did not
clarify the prosecutor=s comments for the jury and, instead,
misled the jury into believing it could find appellant guilty of murder if
Jermarxian committed the murder.








3.       The Error
Resulted in Egregious Harm

The jury found appellant guilty of murder and found
Jermarxian, who testified he believed he fired the fatal bullet, guilty of
manslaughter.  Although the jury=s verdict may
indicate that the jury believed that appellant, rather than Jermarxian, was
guilty as a primary actor and that Jermarxian was merely reckless, we cannot
know whether the jury found appellant guilty of murder based on an erroneous
legal theory.  But we do know one important fact:  the jury was told in the
application paragraph in the charge that it could convict appellant on an
invalid legal theory.  We cannot tell from the verdict or record whether or not
the jury convicted on that basis, which would be error, but we can tell that
neither the rest of the charge, nor the evidence, nor the jury arguments set the
record right and that the jury was affirmatively told it must follow the law
given to it in the charge.  These points factor heavily in our analysis and tip
the scales toward egregious harm.

One
might argue that the jury could not have relied on the improper jury charge to
find appellant guilty of murder because the jury did not find Jermarxian guilty
of murder.  However, as a reviewing court, we cannot adopt this argument.  








A jury
may render logically inconsistent verdicts as to different co-defendants, and Ait is not our duty to unravel the
rationcinations of the jury=s collective logic.@  See Odom v. United States,
377 F.2d 853, 857 (5th Cir. 1967) (and cases cited therein); see also Ruiz
v. State, 641 S.W.2d 364, 366 (Tex. App.CCorpus Christi 1982, no pet) (A[C]onsistency is not necessary in
criminal verdicts where the verdicts are returned in a joint trial of two or
more indictments.@).  Moreover, the trial court=s charge included the following
instruction to the jury:  AYour sole duty at this time is to determine the guilt or
innocence of the defendant under the indictment in this cause and restrict your
deliberations solely to the issue of guilt or innocence of the defendant.@  As a result of this instruction, we
cannot speculate that the jury considered and applied the law consistently to
both co-defendants.  A[A]n individualized assessment of the reason for the
inconsistency would be based on either pure speculation, or would require
inquiries into the jury=s deliberations that courts generally do not undertake.@  United States v. Powell, 469
U.S. 57, 66 (1984).  Although much of this body of law is federal, we have
found no state case law that contradicts it.  See Jackson v. State, 3
S.W.3d 58, 61B62 (Tex. App.CDallas 1999, no pet.); Moranza v. State, 913 S.W.2d
718, 724 (Tex. App.CWaco 1995, pet.ref=d); Ruiz, 641 S.W.2d at 366.

Appellant=s charge incorporates the idea set
forth in the above case law that we review the viability of a verdict as it
relates to an individual defendant, not as it relates to the group of
defendants, requiring harmony among the defendants= verdicts.  The court instructed the
jury to consider the two charges before itCone for Adrian and one for JermarxianCseparately, thereby requiring the
jury to focus first on one of the brothers= individual guilt or innocence and
then on the other=s guilt or innocence.  While looking at a particular charge,
the jury was required to consider the merits of that charge alone, and none
other.

As the
federal case law cited above reflects, juries frequently treat co-defendants
differently, and that appears to have happened here.  Focusing on Adrian only,
as ordered by the court, the jury apparently believed Adrian was highly
culpable, finding him guilty of murder as a principal or as a result of the
improper party charge.  But, when the jury considered Jermarxian=s charge, the jury apparently decided
to be more lenient or believed that Jermarxian was less culpableCpossibly believing that Adrian
started the fatal events in motion and was primarily responsible for the death
that ultimately transpiredCand chose to find Jermarxian guilty only of manslaughter.[8]









Thus,
having been told to review each charge separately, but not having been told to
harmonize its findings, the jury was not to consider any potential
inconsistency in its verdicts.  Because of this, we cannot say that the jury
did not rely on the improper party offense to find Appellant guilty of  murder
based on an improper party offense.  As we have already noted, such Aan individualized assessment of the
reason for the inconsistency would be based on either pure speculation, or
would require inquiries into the jury=s deliberations that courts generally
do not undertake.@  Powell, 469 U.S. at 66.  We can do neither.  

For these reasons, looking only to appellant=s charge without
considering Jermarxian=s charge or verdict, we hold that the
charge error affected the very basis of the case and deprived appellant of a
valuable right; it authorized the jury to convict him of a murder committed by
someone else without requiring the jury to find the elements of party
responsibility beyond a reasonable doubt; this is not an offense under the laws
of our state.  This error was so harmful that appellant was effectively denied
a fair and impartial trial.  See Sanchez, 209 S.W.3d at 121 (holding
charge error, which authorized jury to convict without finding every requisite
element of the offense beyond a reasonable doubt, was egregious based on the
entirety of the charge, the contested evidence, and the arguments of counsel); Hammock
v. State, 211 S.W.3d 874, 879 Tex. App.CTexarkana 2006, no
pet.) (concluding egregious harm shown when some of alternative theories in
charge permitted conviction for conduct not defined as an offense); Guevara,
191 S.W.3d at 210 (holding egregious harm resulted from erroneous jury
instruction authorizing conviction based on legally inadequate theory).[9] 
We therefore sustain appellant=s second issue.








III.      Conclusion

In summary, the jury was given four legal theories by which
it could convict appellant of murder and one of those theories was invalid.  We
cannot tell which ground the jury relied on to convict appellant of murder. 
Nothing in the charge or trial corrected the misdirection the jury was given,
and it resulted in egregious harm.  Consequently, we reverse the trial court=s judgment and
remand for a new trial.

 

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

Judgment rendered
and Majority Opinion filed July 24, 2007.

Panel consists of Chief Justice Hedges and Justices Fowler
and Edelman.  (Edelman, J. Dissenting.)

 

Publish C Tex. R. App. P. 47.2(b).









[1]  Jermarxian Deandre Green was indicted Cause No.
1033352, in the 185th District Court of Harris County.  Upon finding Jermarxian
guilty of manslaughter, the jury assessed his punishment at eighteen years= confinement in the Texas Department of Criminal
Justice, Institutional Division.  This Court considered his appeal in Cause No.
14-06-00155-CR. 





[2]  The Expedition was described as having
Lamborghini-style doors that opened upward and spinning rims, among other
things.





[3]  Hooper testified that appellant said to Kelegon, ADo y=all got a
problem with me?,@ to which Kelegon responded, AMan, I don=t
even know you@ and AWho are you?@





[4]  When the police examined the Caprice, they found a
box containing several .25 caliber bullets in the glove compartment.  Also
found was a gun case, and inside the case was a clip containing 9 millimeter
bullets, which Hooper testified was locked and in the trunk of his car along
with other possessions because he had recently moved.  In addition, the police
found a lockbox containing a box of ammunition for a .22 caliber rifle.





[5]  Darrell Stein, a firearms examiner, compared the bullet obtained from
Kelegon=s head to the six bullet fragments
recovered from the Caprice by Officer Riddle.  Although he could not determine
with certainty that they were all fired from the same gun, all had sufficient
characteristics to enable him to testify that they could have been fired from
the same type of firearm, which would have included the 9 millimeter
semiautomatic pistol. 





[6]  Properly stated, that part of the charge should have authorized the
jury that it could find appellant guilty of murder if it found beyond a
reasonable doubt that AJermarxian Deandre Green, did then
and there unlawfully, intentionally or knowingly cause the death of Quinton
Kelegon, by shooting Quinton Kelegon with a deadly weapon, namely, a firearm,
and that the defendant, Adrian Dewayne Green, with the intent to promote or
assist the commission of the offense, if any, solicited, encouraged, directed,
aided or attempted to aid Jermarxian Deandre Green to commit the offense.@  





[7]  In the federal system, when a general verdict is
entered after the jury was presented with one valid legal theory and one
invalid and it is impossible to tell which ground the jury selected, the case
would ordinarily be reversed without further inquiry.  See Griffin v. United
States, 502 U.S. 46, 52 (1991); United States v. Tomblin, 46 F.3d
1369, 1385 (5th Cir. 1995).  Our set of facts is slightly different in that we
have several valid legal theories and only one invalid theory, but we have
found no case stating that this would make a difference.  Regardless, although
a federal court would reverse on this set of facts, in Texas, our inquiry must
continue so that we can fully apply Almanza to determine if the error
resulted in egregious harm.  See Guevara v. State, 152 S.W.3d 45, 52B53 (Tex. Crim. App. 2004).





[8]  We do not know in what order the jury considered the
two charges.





[9]  The dissent acknowledges that the jury charge was
erroneous, but posits that no egregious harm resulted because the evidence was
sufficient to convict appellant on a correctly instructed alternative theory of
culpability.  However, courts have distinguished between a charge that
correctly states the law but erroneously charges on a theory of guilt unsupported
by the evidence and a charge that contains a misleading statement about the lawCas we have here.  The courts have rejected using the
same analysis in the two situations.  See, e.g., Hammock, 211 S.W.3d at
879 (distinguishing charge error in which several alternative theories were not
offenses under the law as one that Apresents
a situation that has ramifications far beyond the typical possibility that a
person was convicted of committing an offense one way instead of another way@ and finding reversible error); Guevara, 191
S.W.3d at 206B07 (refusing to presume evidence was sufficient to
support guilty verdict under alternative theory when charge included legally
invalid theory); see also Payne v. State, 194 S.W.3d 689, 696 n.2 (Tex.
App.CHouston [14th Dist.] 2006, pet. ref=d) (acknowledging distinction between alleged
misstatement of the law and alleged error in charging the jury on a theory of
guilt not raised by the evidence and noting appeal before it was one involving
sufficiency of the evidence).  The reason for this distinction is that 

 

[J]urors are not generally equipped to determine
whether a particular theory of conviction submitted to them is contrary to lawCwhether, for example, the action in question is
protected by the Constitution, is time barred, or fails to come within the
statutory definition of the crime.  When, therefore, jurors have been left the
option of relying upon a legally inadequate theory, there is no reason to think
that their own intelligence and expertise will save them from that error.  

 

Guevara, 191 S.W.3d at 208 (quoting Griffin v. United
States, 502 U.S. 46, 59 (1991)).  Additionally, the dissent contends that
language in the charge instructing the jury on the requisite mental state a
person must have before being found guilty of murder effectively cured the
charge error so that the jury would know not to find appellant guilty of murder
based solely on Jermarxian=s conduct. 
However, the language the dissent points to is not included in the paragraphs
applying the law to the facts, and so it does not instruct the jury on what
facts it must find to convict appellant under a correct statement of the law. 
Moreover, the language merely restates the intent required of a principal
actor, which under the erroneous instruction would have been Jermarxian rather
than appellant, and so it does not cure the erroneous omission of the parties
instruction in the application paragraph.  We cannot assume that the jury would
have deduced and applied the law correctly based on this separate instruction.