

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00344-CR
No. 02-17-00345-CR

_____

BENJAMIN TYRON JENKINS, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court Nos. CR16-0738, CR16-0739

_____

Before Gabriel, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

A jury found Benjamin Tyron Jenkins guilty of (1) possession of less than one gram of a controlled substance (methamphetamine) and (2) fraudulent use or possession of identifying information. In both cases, the jury assessed his punishment at two years' confinement in state jail and a $10,000 fine. The trial court sentenced Jenkins accordingly, and the judgments are running concurrently.

Jenkins appealed and asserts two points. First, he contends that the evidence is insufficient to support his possession-of-a-controlled-substance conviction. Second, he argues that because the deputies had no reasonable suspicion to justify his prolonged detention, the trial court erred by admitting the "fruits of an illegal search and seizure." We affirm.

## I. The Evidence

### A. The Stop, the Search, and the Arrest

Around 1:00 a.m. on September 2, 2016, Deputy Gerry Olson followed a slow-moving vehicle for two to three miles, after which the vehicle stopped in the middle of the roadway—an offense for which Olson said he could have taken the driver to jail. A female driver, Tina Parker, got out of the car and told Olson that she had agreed to give her passenger, Jenkins, a ride to Jenkins's girlfriend's house in exchange for gas money and that she and Jenkins were lost. Olson was familiar with the street that they were looking for (Billabong Court) and estimated that it was about three miles away.

Olson asked Parker for her driver's license, and Parker went to the driver's side door; with his flashlight, Olson looked inside the car, including looking at the driver's side floorboard, and saw nothing suspicious. Describing precisely what Parker did—because what she did or did not do at this moment became significant later—Olson said, "[Parker] reached into the car, which the driver side was open. She never re-entered the car at all. She just reached in and grabbed her purse, her wallet, and got her identification out of it. And then we went directly back to the rear of the vehicle." Parker showed Olson her identification card and acknowledged that her driver's license was suspended. Driving without a license was also an offense.

Just from talking with Parker, Olson found her story—which included her initially denying knowing who her passenger was and her claiming that she and the passenger had met at a game room where she was "selling some pots and pans"—odd, so he called for backup. Explaining that decision, Olson said, "In the academy, when the hair on the back of your neck stands up, [we are taught] to trust that feeling," and, "[A]s soon as I got out of the car and started talking with [Parker], that's the feeling I got."

Jenkins, who was in the front passenger seat, kept looking over his shoulder at Olson, making him uneasy, so Olson broke off his conversation with Parker and went to the driver's side window to speak with Jenkins. While doing so, Olson took a second look at the vehicle. Jenkins verified Parker's story but refused to give his name

or provide any identification, so Olson went back to his patrol car to verify Parker's license status and to see if she had any outstanding warrants.

Deputy Jacob White then arrived at the scene, and Olson instructed him to "keep an eye on" Jenkins. So White went to Jenkins and "basically just kind of . . . chat[ted] with him."

Dispatch eventually informed Olson that Parker's driver's license was suspended and that she had no outstanding warrants. Around this time, White informed Olson that Jenkins had also refused to identify himself to White and had refused to get out of the vehicle.

But White also told Olson that while chatting with Jenkins, White had seen a pill bottle on the driver's side floorboard, something Olson thought he would not have missed when he (Olson) had looked into the vehicle earlier.

Before taking another look himself, Olson asked Parker if there was anything illegal in the car, and she answered, "Not that I know of." This response did not allay Olson's suspicions; he explained that when people on the street cannot bring themselves to say "[Y]es," they frequently dodge the question by answering, "[N]ot that I know of." At Olson's request, Parker then explicitly agreed that he could search her car.

Olson went back to the car. "The pill bottle was completely in plain view, [nowhere] near the seat. It was directly in the [middle of the] floor mat," he said.

4

Because Parker had no opportunity to put the pill bottle there, Olson believed that Jenkins must have placed it there while Olson and Parker were talking.

The deputies again asked Jenkins to get out of the car, and this time he complied. Without being asked to do so, Jenkins then turned around to face the car and put his hands on it. According to Olson, Jenkins was "already assuming the position to be patted down," which Olson found consistent with someone who had been through that experience before. White asked Jenkins if he could pat him down for weapons, and Jenkins agreed. And this time, when asked, Jenkins gave both his name and date of birth. Feeling something in Jenkins's pockets, White next asked for and received Jenkins's permission to search them, and White found two wallets. Finally, White asked for and received Jenkins's permission to open and search the wallets.

Inside the first wallet, which Jenkins identified as his own, White found a driver's license for a Victor Hernandez Bara. Olson did not recall finding Jenkins's driver's license in that wallet.

The second wallet was one that Jenkins claimed to have found in a driveway. Inside, the deputies found a credit card for a Rebecca Massey and social security cards for Mark Filewood, Collin Filewood, and Jourden Linebager. After running a check on Massey, Olson learned that she was deceased. Also in this wallet the deputies found a prepaid debit card in Jenkins's name and numerous other documents with

numerous other people's names on them. By this point, Olson thought that Jenkins was involved in identity theft.

Olson then searched the vehicle (as Parker had allowed him to do) and retrieved a see-through pill bottle from the driver's side floorboard, inside of which were pills, marijuana, and what appeared to be "a [usable] amount of methamphetamine" in a clear or whitish baggy. The prescription label bore Massey's name and address, which was on the same street (Billabong Court) that Jenkins and Parker were looking for.[1]

Continuing his search, Olson found between the center console and the front passenger seat a manila envelope with Jenkins's name on it. Inside that envelope the deputy found different pieces of mail and paperwork and a small yellow plastic baggy also containing what Olson believed to be methamphetamine. Under the middle console, Olson found a cigarette package containing a partially smoked marijuana cigarette. And in the car's backseat area, Olson found a brown leather laptop bag, which Jenkins admitted was his, containing more mail with Jenkins's name on it and a glass methamphetamine pipe.

Olson then spoke again with Parker, who denied that any of the drugs found in the car were hers. Finding neither drugs nor other people's identifying information on

---

[1]Massey's name was also on a credit card found in one of Jenkins's wallets.

Parker, Olson decided not to arrest her because, in his mind, all the "links" pointed to Jenkins.

Olson arrested Jenkins for possession of methamphetamine and marijuana and for identity theft; put him in Olson's patrol car; and read Jenkins his *Miranda* rights, after which Jenkins agreed to talk with him.[2] Although Jenkins denied possessing any of the methamphetamine, he stated that he used methamphetamine and claimed ownership of the marijuana cigarette found in the box under the console and the laptop bag containing the methamphetamine pipe.

## B. The Two Baggies, Their Weight, and Their Content

Michelle O'Neal, a forensic scientist working in the drug-chemistry section at the Tarrant County medical examiner's office, testified that the contents of the baggie found in the pill bottle weighed 0.305 grams and that the contents of the second baggie found in the envelope with Jenkins's name on it weighed 0.176 grams. After testing, she determined both were methamphetamine. The combined weight of both baggies' contents was less than one gram.

## C. Bara, His Lost Driver's License, and the Absence of Permission

Victor Bara testified that the driver's license that the deputies recovered was his, that he had lost it, and that he later had to replace it. Bara had not given anyone

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966).

permission to possess his driver's license and, more specifically, had never given Jenkins his permission to possess his driver's license.

## II. Discussion

### A. Because the methamphetamine found in the envelope with Jenkins's name on it supports the verdict, Jenkins's first point attacking whether the methamphetamine found in the pill bottle was sufficiently linked to him is moot.

In his first point, Jenkins asserts that the evidence is insufficient to show that he possessed the methamphetamine found in the pill bottle: "The facts[] and inferences therefrom[] point more toward Parker possessing the methamphetamine[,] and [Jenkins] was convicted because of his proximity to someone else's drugs." But his point does not contest the evidentiary sufficiency concerning the methamphetamine found in the envelope with Jenkins's name on it. The methamphetamine found in that envelope, standing alone, sufficed to support the verdict, thereby rendering Jenkins's complaint attacking the methamphetamine in the pill bottle moot. *See* Tex. R. App. P. 47.1; *see also Ex parte Reyes*, 474 S.W.3d 677, 680 (Tex. Crim. App. 2015).

We overrule Jenkins's first point.

### B. Jenkins had no standing to contest the search of Parker's car, and he consented to the search of his person and his possessions.

In his second point, Jenkins complains that the trial court erred by admitting evidence obtained from the searches of Parker's car and his person because the deputies detained him longer than any reasonable suspicion justified. Except for

Bara's driver's license, to which Jenkins stated he had no objection, Jenkins asserted at trial that all the other items were the "fruits of an illegal search and seizure." Representing himself at trial, Jenkins did not explain or express his objection with any greater particularity. *See* Tex. R. App. P. 33.1.

### 1. The Search of Parker's Car: Parker's Consent, and Jenkins's Lack of Standing

A portion of Jenkins's argument focuses on Parker's consent to search her vehicle: "The methamphetamine and marijuana were discovered after Deputy Olson received consent to search from Parker. And that consent to search was obtained as a result of the prolonged detention lacking in reasonable suspicion." But as a nonowner passenger, Jenkins had no standing to challenge the search of Parker's vehicle. *See State v. Allen*, 53 S.W.3d 731, 732 (Tex. App.—Houston [1st Dist.] 2001, no pet.). We thus limit Jenkins's complaint to the search of his person and the possessions taken from his person.

### 2. The Search of Jenkins's Person and Possessions: Jenkins's Consent; Waiver

Although Jenkins complains about the delay, he does not assert that it rendered his consent involuntary. Just the opposite: he acknowledges that the search was consensual. And because Jenkins consented to the searches of his person and possessions, we hold that he waived any complaint about those searches. *See Reyes v. State*, 741 S.W.2d 414, 430 (Tex. Crim. App. 1987); *Resendez v. State*, 523 S.W.2d 700, 702–03 (Tex. Crim. App. 1975); *Byrd v. State*, 456 S.W.2d 931, 933 (Tex. Crim. App.

9

1970); *Ohlfs v. State*, No. 02-11-00376-CR, 2013 WL 1457756, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, no pet.) (mem. op., not designated for publication); *Roth v. State*, 917 S.W.2d 292, 299–300 (Tex. App.—Austin 1995, no pet.).

We overrule Jenkins's second point.

## III. Conclusion

Having overruled Jenkins's two points, we affirm the trial court's judgment in both cases.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 14, 2019